## Smith's Administratrix v. Middlesboro Electric Company.

(Decided March 26, 1915.)

### Appeal from Bell Circuit Court.

1. Electricity—Care Electric Light Company Required to Exercise.— An electric light company is required to exercise the highest

degree of care and skill known, which may be exercised under the same or similar circumstances, to prevent injury to persons, who are its patrons, or who may be at places, where they have a right to be, for either business, or pleasure, or who may be engaged in doing things, which they have a right to do.

2. Electricity—Duty of Electric Light Company to Exercise Highest Degree of Care.—An electric light company, engaged in distributing electricity for lighting or other purposes, owes the duty of exercising the highest degree of care and skill, in inspecting its wires, equipment and apparatus, and keeping same in repair, to prevent injury to persons, and such duty extends to all wiring, which may be situated upon roads, and streets, and places where persons may be expected to be, although such wiring is not the property of the company, if the company allows its current of electricity to pass upon the wires.

3. Electricity—Electric Light Company—Inspection.—An electric light company, engaged in generating and distributing electricity, does not owe the duty of inspection of the wires, fixtures, and apparatus, used and owned by persons, and which are situated in their houses for lighting purposes, where the only contract is for the electric light company to connect its system with the wiring of such parties, and furnish the current of electricity, and it is not responsible for any injury, which a patron may suffer, from a cause arising solely from the defective condition of such inside wiring and apparatus, unless the company has knowledge of such defective condition, and having such knowledge, sends its current into the building.

4. Electricity—Contract of Electric Light Company to Furnish.— Where an electric light company has a contract to furnish electricity for lighting a building, and, also, owns and installs the wiring and fixtures for it, in the building, it owes a duty of inspection of such wiring and fixtures, and the right to do so, and must exercise the highest degree of care and skill in such inspection, and keeping same in repair.

5. Electricity—Electric Light Company—Inspection.—Although an electric light company may not owe a duty of inspection and repair of the inside wiring and fixtures for lighting purposes, in a house owned or used by the occupant, and to which it furnishes the necessary current of electricity, and although such wiring and fixtures may be in defective condition, it is responsible for injuries suffered from its sending into the building an unnecessary, unusual, and dangerous current of electricity, without which the defects in the wiring and apparatus would be harmless.

6. Electricity—Electric Light Company—Degree of Care Required of.—Patrons of an electric light company, in the use of the lights in their houses and places of business, have a right to assume, that the wires, equipment, and apparatus of the company, for the generation and distribution of the electrical current, are in good condition, working order, and repair, unless they have knowledge to the contrary; and they have a right to assume, that the

company is exercising the highest degree of care and skill known, which may be exercised under the same or similar circumstances, in the inspection and repair of its equipment, wires, and apparatus, and the use of all known necessary devices, to prevent injuries from the electrical current used, unless they have knowledge to the contrary.

7. Trial—Instructions.—One can not object to the giving of an instruction, which he has asked for and offered in writing.

8. New Trial—Verdict—Impeachment.—The affidavit of a juror can not be received to impeach his verdict, or to prove the misconduct of himself, or of his fellow jurors, upon a motion for a new trial.

9. Trial—Jury.—There is no express provision of the statutes, which authorizes the court, in the trial of a civil case, to put the jurors in charge of an officer, and to require them to remain together, until the case is finally submitted to them.

10. New Trial—Motion For.—The Civil Code, Section 343, requires that a motion for a new trial, based upon Subsection 2, of Section 340, must be sustained by affidavits, and does not provide for an examination of witnesses orally in court, in support of the motion.

11. Trial—Jury—Submission to Jury.—Under circumstances, the trial court might be justified in placing a jury in a civil case in charge of an officer, before the final submission of the case to them, but such action could only be in furtherance of justice, and to prevent improper influences reaching the jury, and would be a matter entirely within the sound discretion of the trial court, and in such state of case, this court would rely upon the discretion of the trial judge, as to whether a violation of his order to the jury to remain together, was prejudicial to the litigants.

BLACK, BLACK & OWENS and B. B. GOLDEN for appellant.

T. G. ANDERSON, CHARLES I. DAWSON and HAZELRIGG & HAZELRIGG for appellee.

OPINION OF TNE COURT BY JUDGE HURT—Affirming.

A. T. Smith, manager of the A. T. Smith Drug Company, was killed by an electric shock, at a time when he was using an electric light, in the drug store of the company. The electricity for the lighting was furnished by the Middlesboro Electric Company, a corporation, engaged in generating and distributing electricity for lighting purposes. The appellant, as administratrix of decedent, sued the electric company for $50,000.00 in damages, for the loss to decedent's estate by his death, alleging that his death was caused by the gross negligence of the servants of appellee, who were in charge

of its plant and equipment for furnishing the light to the drug company. The appellee, by answer, traversed all allegations of negligence, and in addition, plead contributory negligence on the part of the decedent, which latter plea was denied by reply. A trial by jury was had upon the issues made, which resulted in a verdict for appellee. The appellant filed grounds, and moved the court for a new trial, which motion was overruled. The necessary exceptions were saved, and she now appeals to this court.

The grounds for the new trial will be considered in the order offered by the appellant.

The first of the grounds is alleged error of the court in overruling her motion to file her fourth amended petition. This amended petition was not offered until after the answer and reply had been filed, and not until the third day after the trial had begun, and had been proceeding. In such a state of case, it is a matter within the sound discretion of the trial court to permit an amendment to pleadings. This pleading, which was offered, is only a statement in amplified form of the allegations of the original petition, and while it does not specifically allege any particular portion of the machinery, or equipments of the electric light company, as being out of repair, or as being a particular cause resulting in the death of the decedent, it is substantially an allegation, that all the machinery, lines, and equipments were out of repair, or not properly fixed and placed, and that the appellee was negligent in thus allowing the machinery, equipments, transformers, and other parts of its plant to be out of repair, or not properly constructed; and its failure to provide devices which were considered necessary to make the operation of an electric light plant safe, so as to prevent any loss of life or injury by reason of its operation, and, furthermore, it contained a statement of the law, or what it alleged to be the law, applying to a corporation engaged in generating and furnishing electric light. It will be borne in mind, that the appellee, before it filed its answer, filed a written motion, and moved the court to require the appellant to make more specific her petition in its allegations as to the specific place, or thing, or act or condition of negligence on the part of the appellee which was complained of. The court overruled this motion. It does not appear whether it was done upon the objection of the appellant

or not. We do not think the court abused its discretion in refusing to allow this amendment to be filed, because the allegations of the petition are sufficient to allow proof of any act of negligence on the part of the appellee, which resulted in the death of the decedent. Such negligence would consist of any improper operation of the machinery, or the use of incompetent employes, or the failure to use and maintain wiring properly made and sufficient to convey the electrical current in safety, or transformers not in good condition and repair, so as to reduce the voltage passing over the primary wires and on to the secondary wires, or any failure to keep the wiring properly insulated, or the failure to use any necessary devices for the protection of persons from this electrical current or to fail to inspect for the discovery of defects or want of repairs, or any other negligence, or failure to perform its duty as required by law. The appellee would have more just cause of complaint for the failure of the petition to make definite and certain the allegations in regard to the cause, or acts or conditions in which the alleged negligence consisted and which is alleged to have caused the injury, but under the interpretation put upon the petition by the court, we do not see how the refusal to allow this amended petition to be filed, could have been prejudicial to the appellant.

The failure to allow it to be filed, on account of the allegation in it, that the damages, which the estate of the decedent had suffered, was $100,000.00, instead of $50,000.00, as alleged in the original petition, was not prejudicial, as the appellant failed of any recovery at all.

The error alleged, because the court refused to allow the third amended petition to be filed, was not prejudicial, for the reason above stated, as it contained only an allegation, that the damages should be $100,000.00, in place of $50,000.00.

The third ground relied upon for a new trial, are alleged errors of the court in rejecting and refusing to admit material and competent evidence on behalf of the appellant upon the trial and permitting incompetent evidence to be heard over the objection of appellant. Complaint is made that the court permitted the witness, Starling, to be asked and to answer the question, "If the cord had been tied, would there have been any trouble?" and to which he answered, "No." This witness,

at the time, was testifying with reference to his efforts to separate decedent from the light which he was holding after his death, and the question only meant, that, if the cord had been tied to something, that the decedent could have been pulled away from it, and his grasp loosened. There was certainly nothing prejudicial, either in the question or answer. The jury must have so understood it. Objection is made to the testimony of this witness, because he was allowed to state, that, after the separation of the decedent from the light, that it was lying upon the floor, and set the floor on fire, "That there was nothing unusual about that." This seems to have only meant, that it was nothing unusual in electrical operations for a light, where the globe was broken, and forms an arch upon the floor, and coming in contact with a wet floor, like that was, to set it on fire. The statement of this witness, that when he took the decedent by the ankle to remove him, that he was receiving about 110 volts of electricity, and not exceeding 250 volts, was a competent statement for the witness to make, in the light of the fact that he was an electrical expert, and had had experience in receiving shocks frequently, and that in the position in which he was holding decedent by the ankle, that he received practically the same amount of electricity, while in that situation as the decedent did. Of course, that was a mere matter of opinion, but that is all the evidence, from the nature of the circumstances, that could be had upon a question of that kind, and the witness seemed qualified by experience and education to express such an opinion, in evidence. The witness, John Hash, stated that shortly after the death of the decedent, he saw some person climbing the electric light pole in front of the decedent's place of business, but that he did not know who it was. The court refused to allow the witness to answer, whom he believed it to be. This was clearly correct, because the evidence does not show in any way that whoever it was who went up the electric light pole, that such person had any connection with the appellee in this case by any fact or circumstance, and the mere guess of the witness, formed upon reasons possibly, other than his knowledge acquired by personal observation, would have been prejudicial to the appellee.

D. Z. Gibson, who testified that he was a graduated embalmer of dead bodies, and that he had seen the bodies of two persons, who had been electrocuted, and after de-

scribing the condition of the body of the deceased, and the condition of his veins, arteries, and blood, was asked to state, what, in his opinion, was the cause of the death. This was objected to and the court sustained the objection, when the avowal was made, that if permitted to answer, he would answer that in his opinion, his death was caused by electricity. The court was correct in this ruling, because the witness was not asked to confine his opinion to the condition in which he found the body of the decedent, and his limited experience as to persons, who had come to their death by electrocution, was not sufficient to qualify him to give an opinion upon that subject.

Eugene Smith gave testimony to the effect, that some time after the death of the decedent, but he was not able to say how long after his death, or at what time, he observed that the insulation was worn off the wires which came from the pole to the top of the window and into the building where the decedent's death occurred. This evidence was excluded, and we think properly so, because it was too indefinite as to time, and was no evidence of the fact that the wire was in that condition at the time of the decedent's death.

The witness, Squires, after making testimony qualifying himself to testify as an expert in the operation of electricity and electrical apparatus, stated that about seven months after the death of the decedent, and when there had been no changes made, since before the death of the decedent, in the transformers, from which the secondary wire that furnished light in the building in which decedent came to his death; that he had made a test to determine whether there was any defect of any kind in the transformer, and whether it was not working properly, and the method adopted by him to make the test, and the results of the test, he had reduced to writing, and that the test, as made by him, would show clearly whether there was then any defect in the transformer, and whether any volume more than 110 volts of electricity was escaping from the transformer onto the secondary wires, would be shown by the test which he had made. This written test was submitted to several other witnesses during the trial, who were experts in the operation of electrical machinery and the apparatus of electric light plants, and they were asked to state whether, or not a test made in accordance with the manner in

which the writing showed that the test had been made, would demonstrate the fact as to whether or not the transformer was properly doing its office, or any defect in it. This evidence was all objected to, and exceptions taken to its admission, and appellant now complains of its admission. In view of the fact that the testimony showed that the transformer was, at the time of the making of this test, in the same condition that it was at the time of the decedent's death, and that no repairs had been made upon it, and that when a transformer is broken down it never rights itself by its own action, or that of the electrical current, but has to be taken down and repaired, we think the written test was competent evidence for what it was worth, although it was made long after the accident. The submission of the writing to the other expert witnesses, and the expression of their opinions, as to what would be the effect of a test applied of that kind, was simply the propounding of a proper hypothetical question to an expert witness, and asking his answer thereto.

At the close of the evidence, the appellant offered in writing, instructions, which she designated in the record, 1a, 2b, 3c, 4d, 5e, 6f, 7g, and 8h, and appellee objected thereto, and the court refused to give each of them, except 3c and 8h. The appellee offered written instructions, designated in the record as No. 1, No. 2, No. 3, No. 4, and No. 5, to all of which appellant objected. The court refused to give either of these instructions, except No. 3. The court then gave instructions, in addition to the ones offered by appellant and appellee, numbered 1, 4, 5, 6, and 7. To the adverse rulings of the court in giving and refusing to give instructions, each party saved proper exceptions.

From the evidence, it seems that there were six theories offered as to the cause of the death of decedent. One theory was, that the transformer from which the secondary wire led into the drug store, in which the death occurred, was defective or broken down, or in some way, was out of proper condition for the performance of its office, and that by reason of such defective condition, the primary current of 2,300 volts of electricity passed from the primary wire to the secondary wire, and thence into the wire to which the light that decedent was using, was attached, and that this great and unusual current of electricity caused the death.   A

second theory advanced was, that a primary wire had become crossed upon the secondary wire between the transformer and the building in which decedent met his death, and from that cause, the heavy current of electricity reached decedent. A third theory advanced was, that the insulation upon the primary wires leading into the building of decedent had been allowed to become rotten, and to fall off the wires, and thereby enabled lightning to take hold of the wire, and to enter into the building in which decedent was killed, in such volume as to cause his death. A fourth theory was, that lightning, from some unexplained cause, had taken hold of the secondary wire, and entered the wire to which the light, which decedent was using, was attached, in such volume, that his death was caused. A fifth theory was, that his death arose from the defective wiring and electrical apparatus, which was in use in the building, in which the death occurred. A sixth theory advanced was, that the ordinary current of electricity, which was designed to go over the secondary wire into the building, had caused the death, on account of the weakened physical condition of the decedent at that time.

We will not undertake to make any considerable statement of the evidence offered upon the trial, because to do so, would extend this opinion into a volume. The evidence was composed largely of the opinions and conclusions of persons, who were experts in the knowledge and operations of electricity and electrical apparatus, pertaining to plants for the generation and distribution of electricity for lighting purposes. Suffice it to say, that the evidence conclusively shows, that the death resulted from an electrical shock, and there is some evidence conducing to show from facts, or from inferences from the facts, that the death was caused in the manner suggested by each of the theories advanced.

The court, by its first instruction, advised the jury, that it was the duty of the appellee to exercise the utmost care and skill, to install and construct, keep and maintain, inspect and repair, control and operate its lighting plant, machinery, wires, transformers, and equipment free from danger to those persons, including the decedent, who had the right to use its electrical current for lighting purposes, and to make same free from any unusual, unnecessary, and dangerous current of electricity into the building used by the deceased as a drug store,

at the time of his death and directed the jury, that if it believed from the evidence that appellee failed to so construct, maintain, inspect, repair, operate, and control its electrical equipment, wires, transformers, or current of electricity, and by reason of its failure to do any of these things, the deceased received into his body an unusual and unnecessary current of electricity, and as a direct and proximate result, his death occurred, the jury should find for appellant.

The converse of this instruction followed. The court, also, advised the jury by another instruction, that "utmost care and skill," as used in the instruction, means the highest care and skill known, which may be used under the same or similar circumstances.

By another instruction, the jury was advised, that the deceased had the right to assume, in the absence of notice to the contrary, that the appliances, wires, transformers, and equipment of the appellee, were in good order and free from such defects as would permit the flow of an unusual, unnecessary and dangerous current of electricity into the building in use by him.

The court, by an instruction designated as No. 4, advised the jury, that the appellee was under no duty, and owed no duty to the deceased, to inspect or know of the conditions of the wiring, and other electrical fixtures, and equipment in the building in which he was killed, or to maintain same, and was not responsible for their condition, or for the decedent's death, if his death resulted from the defective condition of the wiring, electrical fixtures, or equipment in the building, unless the appellee, its agents or officers, in charge of the operation of its plant, knew of the defective conditions, if any there were, of the interior wiring, or equipment in the building, in time to have cut off its current from the building, and prevented the injury to decedent, which resulted in his death. By a further instruction, the jury was directed, that, although it might believe that the decedent's death was caused by the failure to perform the things, as set out in instruction No. 1, yet, if it, further believed from the evidence, that the deceased was guilty of negligence which contributed to his death, and but for which negligence, he would not have been killed, it should find for appellee.

The court, also, defined negligence and ordinary care; the measure of damages, if they should find for the ap-

pellant; and the manner in which it should write its verdict, if less than twelve, and as many as nine of the jury, should agree upon a verdict. These were all of the instructions which were given.

While an electric light company is not an insurer of the safety of its patrons, nor of people, who may come in contact with its wires and its apparatus, while at places, at which they have a right to be, and engaged at the performance of things, which they have a right to do, it is required to exercise the very highest degree of care and skill in the installation, construction, and operation of its plant, and the highest degree of care and skill in the inspection of its wires, and appliances, and all of its apparatus, to prevent injury to persons, and to that end should provide itself with and use the known necessary devices to control its electrical current, and prevent the passing of dangerous currents of electricity into the houses of its patrons; because the patrons of such a company, and the persons on lawful business in the houses of the patrons, have a right to assume, in the absence of knowledge to the contrary, that the appliances and fixtures of the company are free from defects, which would permit the flow of an unnecessary and dangerous current of electricity into the houses, endangering their lives or safety. Lewis Admr. v. Bowling Green Electric Light Co., 135 Ky., 611; Thomas' Admr. v. Maysville Gas Co., 108 Ky., 224; Bowling Green Gas Light Co. v. Dean, 142 Ky., 678; Mangan's Admr. v. Louisville Electric Light Co., 122 Ky., 476.

The nature of electricity and its operations, and what it may do or may not do, are things very little understood or known by the masses of the people, and are subjects about which, those professing the greatest knowledge of electricity and the effects of it, under circumstances, dispute. It cannot be seen, and can only be felt, and when the effects of it are felt, it is usually too late for the victim to escape its more deadly effects. The suddenness and destructiveness of its effects are such, that those who choose to manufacture and distribute it, although it is a lawful, and now almost a necessary business, they must be held to the highest degree of care in its distribution.

The first, second, and third instructions of the court are in accordance with the doctrines above expressed, and were sufficient, and authorized the jury to find for

appellant, if the death of the deceased was caused by any failure of appellee to exercise the highest degree of care and skill known, and which might be used under the same or similar circumstances, to prevent a dangerous flow of electricity into the building in which he lost his life.

The instruction, which advises the jury, that the appellee did not owe any duty to deceased, to inspect or know of the condition of the wires and other electrical fixtures and apparatus, which were on the inside of the building in which deceased lost his life, and was not responsible for his death, if it resulted from any defect or defects in these wires or fixtures, is very earnestly complained of by appellee. The precise question involved in this case, and covered by this instruction, does not seem to have ever, heretofore, been before this court for determination. The appellant contending that the giving of this instruction by the trial court, was prejudicial error to her, cites the case of Lewis' Admr. v. Bowling Green Electric Light Co., *supra;* Thomas' Admr. v. Maysville Gas Co.; and Bowling Green Gas Light Co. v. Dean, *supra,* as authority for her contention, that the appellee owed a duty to inspect the wires and apparatus in the decedent's building, and to keep them in repair, and to know of their condition, and to give notice to decedent of their condition, if defective or out of repair. It will be necessary to state the facts which the evidence tends to prove, upon the questions relating to the ownership, control, and condition, and use of the wires and fixtures within the building, in which decedent lost his life. There is no question made as to their ownership. They were not owned nor controlled by the appellee. They were either the property of A. T. Smith Drug Company, of which decedent was manager, or else they were the property of the owner of the building, from whom the drug company had leased it. There were nine or ten lights, in all, in the room in which decedent conducted a drug store. All of these lights were in front of the prescription case, which extends across the room, except one, which was at the end of a wire, which extended from a rosette in the ceiling over a partition, and was fastened to the ceiling, until it reached a point in a narrow and dark room, behind the prescription case, where it was suspended from the ceiling, which was about fourteen feet high, and reached quite or nearly

to the floor. When one desired to use this light, he would take it in his hand and carry it to any portion of the narrow room desired. This was the light which decedent was holding in his hand, when he was discovered to be dead. The appellee's wires came into the front of the room, through a window, and made connection with the wiring in the room at that point. The wires of appellee, which made this connection, extended from there along the streets to a transformer, about 400 yards distant, and into this transformer, the primary wire entered from the generator. There was evidence, that at · the time of decedent's death, there was a transformer upon a pole near the building, which was contradicted by other evidence, but this is not material to the question in hand. A witness, who worked in the drug store, stated that he used the light which decedent had in his hand, when his death resulted, from thirty to forty minutes before the death, and saw nothing at that time, which led him to believe that there was anything connected with it, which was not in proper order. He had on several occasions previous to that time, when taking this light in his hand, felt a slight electrical shock, and had spoken of the occurrence, there in the store. A portion of the floor in the narrow back room had some paint upon it, where it had been spilled, and a portion of the floor was wet and damp from rain blowing into the room, through a door. The decedent was found sitting down upon the floor, in this back room, with the light in his hand and dead. The persons, who attempted to enter the room to succor him, were shocked by electricity, and then telephoned to the power house to cut off the current, which was done, and then they proceeded to remove the body. Before the current was turned off, a man took decedent by the ankle to move him, and received a shock, which he estimated to be from 110 to 250 volts. The globe of the light was broken, the fuse burned out, and the key melted. When the current was again turned on, the light was lying upon the floor, and set the floor on fire. The insulation was partially worn off the wires, just above the globe, and the wires broken or burned in two. The decedent's hand, in which he held the light, was scorched, and he could not be detached from it, until the current was turned off. The other lights in the room were not affected, nor were the fuses blown. Several witnesses stated, that at the time of the death, a

severe electric storm was then prevailing in the community, while others stated that the lightning had at that time, ceased to play. The cord by which the light, which decedent had in his hand, was suspended, was proven to have been old, and very much worn, and the proof tended to show that it had been in use in the building for a good many years, and long before the existence of the appellee. Decedent lost his life on May 12th, 1912. A witness testified, that at some time between the first of January, 1912, and the intestate's death, some person, who was connected with the appellee, but whom he does not remember, or in what capacity he was connected with it, under the supervision of Squires, the manager of appellee, put in the cord and light, which was suspended in the back room, and, also a bill receipted by the cashier of appellee, and dated, April, 1912, against A. T. Smith & Company, and in favor of appellee, one item of which was, "lamps, wiring, supplies, etc.," was put in evidence. Another witness for appellant, who worked in the drug store, testified, that in February, 1912, the partitions in the room were changed, making it necessary to rearrange the electric light wires, and that Squires, manager for appellee, came and rearranged them—putting the light which decedent had in his hand, when dead, in the location it was at the time of decedent's death. Squires and Starr, and Price, another manager, testified, that the appellee did not sell decedent any electrical supplies, and Squires testifies, that he did not put in the light in question, nor did he know anything of it. Wasson, a carpenter, testified that the light was in the store when he rearranged the partitions. All of the proof showed that the appellee did not own the inside wiring in any house, to which it furnished light. This was all the evidence relating to the question, as to who controlled or installed the inside wiring in the building. The evidence does not show or indicate, that, even if Squires put in the light and cord in question, that he did it as a representative of appellee, and neither does the account filed prove, that the items there charged are the ones composing the inside wiring of the building. If the decedent or his company purchased the wiring of appellee, and decedent employed some servant of appellee to put them in for him, it does not create a situation, fixing a duty upon appellee to inspect or keep up an inspection, or to notify decedent of repairs needed. It must be borne in

mind, that an electric light company would have no authority to enter upon the private domains of individuals, and inspect the private property owned by such persons, without authority from them to do so. There is no evidence in the case tending to show that there was any custom or practice in Middlesboro, by which the appellee either claimed the right or exercised it, or that created an expectation on the part of others, that it would perform inspection duty of the private property of citizens, which was situated within their houses or places of business. It must be admitted without question, that, if an electric light company should contract to furnish light in a house, and, also, the necessary apparatus for it, on the inside of the house, it would be its duty to inspect it, and, likewise, its right to do so. In the case, at bar, although it is alleged and denied, there is no proof to sustain the allegation of the existence of a contract to furnish electricity to the house of A. T. Smith & Company at all, except to the extent, that it may be presumed, from the fact that it was furnishing the electricity for the lights.

The cases cited by appellant are not in point upon the question for determination. The case of Thomas' Admr. v. Maysville Gas Co., *supra*, was this: The gas company furnished the electricity to propel the cars of the street railway company. The wires of the railway company were constructed along the streets, and a guy wire having broken loose, and not being properly insulated, it was charged with electricity, and as a boy was passing upon the street, he came in contact with it, and was killed. The gas company and the railway company were both held to be liable. It will be noted, however, that the victim was one having no interest or control of the railway company, and besides, the wires were on the public streets, where the gas company had both the opportunity and the right to make an inspection.

The case of McLaughlin v. Louisville Elecric Light Co., 100 Ky., 173, the facts were these. McLaughlin was engaged in painting the Fourth Avenue Hotel, in Louisville, and came in contact with a wire, which extended across from the opposite side of the street, and was attached to the wall he was painting. This was a wire entirely owned and under the control of the electric light company, and on the outside of the house, and the court held that the electric light company, where it owned wires

in the public streets and places, where people were expected to be for their pleasure or business, must exercise the highest degree of care to keep them insulated, and to prevent injury to persons, who were liable to come in contact with them.

The case of Lewis' Admr. v. Bowling Green Gas Light Co., 135 Ky., 615, the facts were these. The gas light company was engaged, for compensation, in furnishing electricity to a line, which was owned by other persons, and which extended outside of the city of Bowling Green. This line became parted in two places, and was hanging down. Lewis, who had no interest in the line, was passing by, and took hold of the wire, probably to pull it down, and put it out of the way. He was shocked and killed. This line was along a public road, where the gas light company had both power and right to make an inspection. This court said: "The company could not escape its responsibilities as the dispenser through the public streets and roads of such a stealthy, deadly force as an electric current of such high voltage upon insecure lines of wires, where the public might reasonably be expected."

The case of Bowling Green Gas Light Co. v. Dean, *supra,* arose from the following state of facts: The gas light company strung its wires upon the poles of the Western Union Telegraph Company. Dean, a servant of the telegraph company, while performing his duties as such, came in contact with a wire of the gas light company, which was not properly insulated. The shock resulted in his death. Dean had no interest in either company. The lines were in the street, and where the gas light company had both the power and the right, and owed the duty of inspection. The gas light company was held responsible, because of the failure to exercise the highest degree of care in keeping the wires properly insulated.

In the case of Mangan's Admr. v. Louisville Electric Co., 122 Ky., 476, a workman in the shops of the Louisville & Nashville R. R. Co. was injured by an electrical shock, caused from a defective transformer in the street, and the question under consideration did not arise in that case. Neither did the question arise in Overall v. Louisville Electric Light Co., 47 S. W., 442; nor Schweitzer's Admr. v. Citizens General Electric Co., 52 S. W., 830; nor in Owensboro v. Knox's Admr., 116 Ky.,

451; nor in Lexington Railway Co. v. Fain's Admr., 71 S. W., 628.

In other jurisdictions, this question has been determined. In the case of the National Fire Insurance Co. v. Denver Consol. Elec. Co., 63 Pac., 949, a depot company sought a recovery against the electric light company, because of damages arising from a fire, caused from a defect in the inside wiring of the depot for electric lights. The court said: "The electric light company under a contract with the depot company, connected their system with the wiring, and delivered a current for use. This was the extent of the connection between the two companies, and it was simply a delivery of a current for lighting purposes by one, and the payment of an agreed price therefor by the other. Whatever, therefore, may have been the character of the wiring or the nature of the work, it was a matter with which the electric company was not chargeable. If it was negligently done, the negligence was the negligence of the depot company, which put it in, or of the firm which that company hired, whose negligence would, of course, be the negligence of the depot company. There was a total absence of evidence which sustained or tended to sustain any knowledge on the part of the electric light company of the character of this wiring."

The Iowa Supreme Court held in the case of Harter v. Colfax Electric Light & Power Co., 100 N. W., 508, that where an electric light wire fell upon a guest in a hotel, and burned him, that the electric light company could not be held responsible, where it had not done the wiring. It was, also, held in that case, that, while the electric light company should be held to the utmost care known, which may have been exercised under the circumstances, in maintaining and operating its plant to prevent injury, yet it was not an insurer against all accidents, and was not responsible in the absence of a showing of a want of care.

The just rule seems to be, that the electric light company should not be responsible for injuries received by persons, arising solely from the defects in the wiring and appliances used for electric lighting purposes, within their own houses, and which are owned by them, and over which they have entire control, and where the only connection between the company and the person using the lights, is a contract between them and the company, for

the company to connect its system with the inside wiring of such parties, and to deliver a current for their use; in the absence of knowledge on the part of the company of the defective condition of the wiring and appliances of such parties. In such a state of case, the company would not owe such person any duty of inspection of their wiring or appliances. Although such inside wiring and appliances were defective, this would not excuse the company for injuries arising from its sending into the house a dangerous current of electricity, and without which the defects in the inside wiring and apparatus would have been harmless.

In the case at bar, the evidence tending to show that appellee sold the fixtures to deceased, and that its servant installed the same in part, was competent evidence, in an endeavor to prove that appellee had knowledge of the defects in same, if there were any, and if it had such knowledge, when the current was sent into the building, and the injury arose from these defects, the appellee was responsible therefor, and this phase of the case, seems to be fully provided for in the instruction complained of. The testimony was very contradictory touching the fact, as to whether appellee sold the inside fixtures to deceased, or installed any part of same, and the knowledge of any defects in the inside fixtures, on the part of the appellee, was a question proper to be submitted to the jury. The jury was the proper judge of the effect to be given the evidence, and the question being submitted to them, no complaint in regard to it can now be heard.

The claim that the trial court was in error in giving an instruction upon the subject of contributory negligence, is not meritorious. There was some evidence upon which to base such an instruction, and besides, the appellant offered such an instruction in writing, connected with another instruction offered by her, and the court did not give the first part of the instruction offered, but severed that relating to contributory negligence of appellee and gave it, substantially as asked, and appellant cannot now be heard to complain of it.

The appellant, also, complains, that the court below was in error in giving an instruction in which it defined negligence and ordinary care, and cites in support of her contention the doctrine announced in Mangan's Admr. v. Louisville Electric Light Co., *supra*. This case,

however, is not in point. The instruction in regard to ordinary care, which this court said ought not to have been given in that case, was one applying to the care required of electric light companies. In the case at bar, the instruction defining negligence and ordinary care, was applied to the care necessary to be exercised by the decedent for his own safety, and was a definition of the terms as used in the instruction relating to contributory negligence. The care required of the appellee was the utmost care and skill known, which may be used under such or similar circumstances, and the court so instructed the jury. The instructions, as a whole, seem to fairly present all of the issues in the case, and to be responsive to the pleadings, and no prejudicial error is apparent from either the giving or refusing to give instructions.

The ground asserted for a new trial, arising from the alleged misconduct of the members of the jury, in separating after they had been put in charge of an officer, and some of them becoming intoxicated, and some of them being biased and influenced by the friends of the appellee, and because they were tampered with, prejudiced and incited against the cause of appellant, and the alleged error of the court in overruling appellant's motion to allow the examination of persons orally and in open court, for the purpose of developing grounds for a new trial, will all be considered together.

The affidavits of each of the jurors were filed, and two affidavits of two members of the jury were filed. The first question to be determined, is what effect are these affidavits of the jurymen, who tried the case, to have? It is a very old rule, in this jurisdiction, that the affidavit of a juror cannot be received, either to prove misconduct of himself, or any one of his fellow jurors. It was so held in the case of Taylor v. Geiger, Hard., 597, and has never been held otherwise. In the case *supra*, the court said: "On the other hand it has been determined, and we think properly, that the affidavits of the jurors ought not to be received to prove misbehavior in themselves and their fellow jurors, but that whenever misbehavior of the jury is relied upon as a ground for a new trial, it ought to be made out by other evidence."

In Steel's Heirs v. Logan, 3 Mar., 397, this court said: "To allow verdicts to be overturned by the evidence of jurors would open a door for tampering with the jury, and might lead to consequences in their opera-

tion on judicial proceedings of a very mischievous and pernicious character."

In Allard v. Smith, 2 Met., 30, this court said: "It is a well established rule that the affidavits of jurors cannot be received to prove misbehavior in themselves or their fellow jurors, as a ground for impeaching their verdict."

To the same effect, is Lucas v. Cannon, 13 Bush 650; Doran v. Shaw, 3 Mon., 415; Com'th. v. Skeggs, 3 Bush, 19; Johnson v. Davenport, 3 J. J. M., 390, and the doctrine of these cases has been adhered to in adjudications of this court upon that subject, until the present time, and may now be considered to be too well established to be again questioned. It has, however, upon the other hand been held, that the evidence of jurors may be received to prove that there was no misconduct upon their part. Com'th. v. Skeggs, *supra;* Howard v. Com'th., 24 R., 613; Gleason v. Com'th., 145 Ky., 128. It follows that the affidavits of the twelve jurors, on file, cannot be considered, in so far as it is proposed to impeach their verdict, by proof of the misbehavior or misconduct of the jurors themselves, or of their fellow jurors. The jury was not put in charge of an officer until the third day of the trial, but after being admonished, as required by Section 320, of the Civil Code, was permitted to disperse when the court adjourned for the night or for meals, as is common in the trial of civil cases. Aside from the affidavits of the jurors, only those of the appellant, Maggie Smith, G. M. Smith, and C. B. Warring, were filed in support of the motion, and those of J. S. Bingham, Chas. Wilson, J. F. Bosworth, Rufus Wilson, and J. F. Rice, were filed by appellee in resisting the motion. The affidavit of appellant states no fact of any kind, except her want of knowledge of any misconduct of the jury, until after the trial. G. M. Smith states in his affidavit, that on the second day of the trial he saw John E. Howard, who was one of the jurors, and J. F. Bosworth go into a saloon. Whether they went into the saloon in company with each other, he does not say. C. B. Warring states in his affidavit, that he went into the saloon on the third day of the trial, and asked the bartender, if Howard and Bosworth came in there on the evening previous and got drinks, and that the bartender told him, that Bosworth and an old man with a white beard came in, and Bosworth ordered drinks for

both, and they then drank them. Affiant, further, says that Howard, at that time, wore a white beard, and that since the trial he had requested the bartender to make an affidavit as to what he had told him, and the bartender declined upon the ground, that if he should do so, it would get him "in bad" with some people. Upon this subject, the juror, Howard, makes affidavit, that he did take a drink with Bosworth at the time stated, but that it occurred in a mere social way, and nothing was said upon the subject of the trial, and Bosworth's affidavit corroborates the statement of the juror. The other affidavits on file, although filed by appellee, prove that on one occasion, Rufus Wilson, who was a candidate for sheriff, gave several of the jurors, at their request, a small quantity of whiskey, each, and that one of the jurors sent by a friend and obtained a quart of whiskey during the trial, which was drunk by some of the jurors in small quantities, during the adjournment of the court for the nights. J. S. Bingham, during the trial, gave two of the jurors, who did not agree to the verdict, money to buy tickets into a show. Chas. Wilson took several of the jurors riding in an automobile on one evening during the trial. The affidavits of Bingham, Rufus Wilson, Chas. Wilson, and Bosworth, each, show that they never at any time discussed the trial with any of the jurors, and no mention of the trial was at any time made, and that neither of them had any interest, or took any interest in behalf of the appellee. In this statement, they were corroborated by the affidavits of the nine jurors, who made the verdict, and are not contradicted by the others, except that Asher says, that Bosworth asked him if he knew that Bingham was a stockholder in the appellee. This statement, Bosworth denies, and in this he is corroborated by Owens, another juror who was present. All of this fails to show that there was any interference with the jury, by any one, much less by any one in behalf of the appellee, or that there was any attempt to tamper with, or corrupt the jury, or to influence, or bias their judgment against the cause of appellant. It does not appear that any of the jurors were under the influence of liquors at any time during the trial, except in the case of one individual, and he was not under the influence of it at any time while the case was being heard or under consideration. The occasional taking of intoxicating spirits, in moderate quantity by ju-

rors, while not a thing to be encouraged, has never been held as misbehavior authorizing the granting of a new trial in Kentucky. Clint Yearry, one of the jurors, was proven to have been intoxicated one evening during· an adjournment of court for the night, for a short time, and Maggie Smith makes affidavit, that at this time, he absented himself from the other jurymen, and came to her house nearby, and made an indecent proposal to her. This he denies, and says that he left the other jurors for a few minutes on that occasion, and went down stairs to see his wife and child, who had sent for him, and saw no one else. Whether he was guilty of the scandalous conduct attributed to him by Maggie Smith, we are not able to say, but if so, it does not appear that such would have any influence, prejudicial to appellant's cause, or that his conduct can in any way be attributed to the procurement of appellee, or that it was done in its behalf.

In the case of Gordon v. L. St. L. & T. Ry. Co., 16 R., 713, this court said: ''A new trial will not be granted on account of the alleged intoxication of one of the jurors, where it does not appear that the ·juror was, so drunk, as to be incapable of properly deciding the cause, and where it does not seem probable that the jury was or would be controlled by one drunken juror.'' It does not appear in the case, at bar, that Yearry was in any wise intoxicated, while either hearing the case, or while considering the verdict. While in a few jurisdictions, it has been held that the intoxication of a juror, at all, during a trial, is a ground for a new trial, but the weight of authority is to the effect, that a new trial should not be granted unless the intoxication interfered with the proper hearing and decision of the case by the jury.

It is insisted that Yearry's separation from the other jurymen is sufficient ground for a new trial. In this, we cannot concur. It does not appear that the successful litigant had anything to do with his conduct, in this regard, or that his conduct could have in any way influenced the verdict. In the case of Bledsoe's Ex'x. v. Bledsoe, 1 S. W., 10, the court said: ''The fact that two of the jurymen separated from the others for a few moments after the cause had been submitted to them for a verdict, and before its rendition, would not vitiate it, because the appellee had nothing to do with it; and it does not appear that there was any corrupt motive or purpose upon the part of anyone; or that during such sep-

aration, the jurymen, who so absented themselves, were approached in any way as to the case; or that anything occurred during such absence, which in any way, or to any extent, influenced or produced the verdict." To the same effect is Smith v. Harrow, 3 Bibb., 446, and Brown v. McConnelly, 1 Bibb., 265.

This was a civil case, and the provisions of the Civil Code do not confer authority upon the court to put a jury, in a civil case, in charge of an officer, and to require the jury to remain together, until after the case has been finally submitted to them. Sections 318, 319, 320, of the Civil Code. If the court has the inherent right to require the jurymen to remain together during the trial of a civil case, and before its final submission, without the expressed authority of the statute, it must be considered to be a matter within the sound discretion of the court and which the court may exercise in furtherance of justice, and in the prevention of improper influence upon the jury, and if such be the only ground upon which such authority is based, it must be left to the sound discretion of the trial court to determine, whether any violation of its order, in reference to the jurors remaining together, is prejudicial to the substantial rights of the parties.

The last ground relied upon for a new trial is the alleged error of the trial court in overruling appellant's motion to permit her to call witnesses, and examine them orally, in an attempt to prove such misconduct of the jury, or of the prevailing party, as would authorize the court to grant a new trial.

Section 340, Sub-section 2, of the Civil Code, provides that a new trial may be granted for "misconduct of the jury, or the prevailing party, or of his attorney."

Section 343, of Civil Code, provides that the application for a new trial must be by motion upon written grounds filed at the time of making the motion, and the grounds mentioned in Section 340, Sub-sections 2, 3, and 7, must be sustained by affidavits showing their truth; and may be controverted by affidavits. No provision is made and no authority given for summoning and examining witnesses orally in court, upon a motion for a new trial. We do not hold that there are no circumstances under which such a proceeding as contended for, may be had, but it is at least, within the sound discretion of the trial court, and the history of the judicial

proceedings in this State has not developed an instance in which such a proceeding was justified, so far as this court has judicial knowledge. The affidavit upon which the motion is made does not develop the fact that any person had refused to make an affidavit, who had any knowledge of any fact; neither does it give any names of persons, who had knowledge, and whose affidavits could not be obtained. The court extended the time, in which appellant could discover the facts relating to misconduct of the jury, and the prevailing party, and in which to secure affidavits and file same, from October 22nd, until December 8th, and when it refused to enter into an investigation of flying rumors, when no foundation for such was shown, it did not abuse its discretion.

The judgment is, therefore, affirmed.