## Columbia Amusement Co. v. Rye.

Oct. 17, 1941.

As Modified on Rehearing Nov. 28, 1941.

Wheeler & Shelbourne for appellant.

C. C. Grassham and James Moore for appellee.

OPINION OF THE COURT BY JUDGE TILFORD—Reversing.

The balcony of the Arcade Motion Picture Theatre at Paducah had been remodeled, and the seats constituting the first row of the upper section placed upon a step or platform seven inches above the floor level of the aisle immediately in front of it. This aisle, thirty-seven inches in width, separates the upper and lower sections, and is known as a cross aisle since it connects the ascending aisles by which patrons reach the row in the upper or lower sections which they desire to occupy. In front of the cross aisle, and separating the two sections of the balcony, is a barrier or wall eighteen inches in height surmounted by an eight inch railing, but no railing or barricade of any kind separates the seats of the front row of the upper section from the cross aisle in front of and below them. The width of the step or platform on which the front row of seats is placed, is thirty-five inches; the distance between the legs of the seats and the edge of the platform, twenty-one inches; and the distance from the edge of the seats to the edge of the platform, thirteen inches. Thus it is readily conceivable that one attempting to leave his seat in the front row of the upper section of the balcony, unconscious of the elevation of the platform above the aisle, might inadvertently step over the edge of the platform into the aisle and be thrown to the floor. This is what

182

appellee, a sixty-seven year old woman, claims happened to her during the afternoon of May 5, 1939, when, in the middle of the main feature, she attempted to leave her seat and depart. She sued appellant, the owner and operator of the theatre, and recovered $5,000 damages for the injuries sustained; but before discussing the legal questions involved, it is necessary to supplement the foregoing brief description of the arrangement of the seats and cross aisle with an explanation of the lighting methods employed, since the alleged deficiency in both constituted the negligence which appellee claims caused the accident.

In the riser of the first step of each ascending aisle is located a small 10 watt light referred to in the testimony as an "aisle light". Other aisle lights are located at the bases of seats in the ascending aisles, and the testimony clearly establishes that the lighting of the ascending aisles was more than sufficient. In addition, there were bracket wall lights, the color and intensity of which varied with the character of the film being shown. Had appellee been injured in ascending or descending the aisles, we would be compelled to hold that the accident could not be attributed to insufficient lighting. But there were no lights of any kind in the cross aisle which was dependent for its illumination upon the wall lights and the aisle lights imbedded in the riser of the first step of the ascending side aisles. During the showing of the feature film the wall lights were blue, the dimmest possible light, in order to obtain the maximum degree of darkness, and, admittedly, the aisle lights at each end were small and cast their rays a distance of only a few feet. The distance between the ascending aisles, the length of the front row, was twenty-five feet, and the seat which appellee occupied was near the middle of the row. Hence, we are unable to say that the illumination of the cross aisle was sufficient to have enabled appellee to see the step-off into the aisle when she arose to depart during the showing of the feature film. She says that she did not see the step-off either before taking or leaving her seat, and she is corroborated as to the insufficiency of the lighting by several witnesses who, shortly after she was injured, visited the theatre and occupied the seat which she had occupied. It may be true as contended by appellant that it was impossible for appellee to have taken her seat

without stepping from the aisle onto the platform. But it was her first visit to the theatre since the balcony had been remodeled; she had entered during the showing of the feature film when the theatre was at its darkest, and had been shown to her seat by the usher with a flashlight; and it is easily conceivable that though she stepped up on the platform in taking her seat, the fact that the platform was elevated above the aisle did not make an impression upon her, at least not one which would endure throughout the entire performance and convict her of contributory negligence as a matter of law. No reason is shown why hooded lights could not have been placed in the riser of the platform bordering the cross aisle, or why a guard rail could not have been placed along the edge of the platform. And thus we are confronted with the necessity of accepting as conclusive the uncontradicted testimony of the architect who designed the balcony, the lighting expert, and others, that the lighting of the balcony was more than sufficient considering the need of darkness during the display of films, and that the balcony was of standard and approved construction, or of holding that the combination of the elevated platform without a guard rail separating it from the aisle and the absence of floor or aisle lights in the cross aisle, created a situation, the preventability and danger of which, laymen were competent to decide. We prefer to adopt the latter course as more consistent with reason and the practical administration of justice, since, after all, lights, platforms, railings, and seats in theatres are within the observation and experience of ordinary men and require no special study to determine whether their arrangement in a particular combination constitutes a hazard to the public.

In addition to the defense of ''No Negligence'', which appellant's counsel conceive was so conclusively established as to have entitled appellant to a directed verdict, appellant's counsel insist that the Trial Court should have sustained their client's plea of ''Assumed Risk'', or at least submitted that question to the jury by giving the following tendered instruction:

''In attempting to leave the motion picture show of the defendant while the picture was being shown, and while the condition of the light was that ordinarily used in exhibiting motion pictures to enable the audience to get a reasonably clear view

of the picture on the screen, the plaintiff assumed the risk incident to such condition of lighting, and if you shall believe from the evidence that the injuries from which the plaintiff complains were caused by such condition of the lighting of the interior of the theatre, and not by reason of the negligence of the defendant, as set out in Instruction No. 1, then the law is for the defendant and you should so find."

It is true that the doctrine of assumed risk is not limited in its application to cases arising between master and servant (Adams' Adm'r v. Callis & Hughes, 253 Ky. 382, 69 S. W. (2d) 711); and it is probably correct to say that a patron of a moving picture theatre of standard construction, entering or departing while the theatre is necessarily darkened, assumes the risk of the generally known danger of ascending or descending steps dimly lighted as contrasted with the degree of illumination ordinarily found in places where darkness is not required. Cases from other states supporting this view are cited by counsel in their able brief. But the doctrine of "Assumed Risk", at least to the extent which we deem it applicable, presupposes knowledge on the part of the injured person of the existing danger, or at least, of the existence of the physical object, which, if not carefully approached or utilized, might cause that danger. In other words, one must know of the existence of steps, or at least be afforded the means of obtaining that knowledge, before he can be said to have assumed the risk of ascending or descending them while they are insufficiently lighted. We cannot say that a patron of a moving picture theatre in the exercise of ordinary care should be required to anticipate or remember the existence of a single step immediately in front of the seat occupied by him fronting a cross aisle, and since appellee testified that she did not see the step, and there is evidence in the record supporting her contention that the light was insufficient to have enabled her to see it, the appellant was not entitled to the instruction tendered. On the contrary, we are of the opinion that the Court properly overruled appellant's motion for a directed verdict and submitted the pertinent issues by instructing the jury that it was the duty of the appellant to construct and maintain the theatre in a reasonably safe condition for its patrons and to maintain its lights

as an ordinarily prudent person would maintain them, considering the purpose for which the theatre was used and having due regard for the safety of its patrons; and that it was the duty of the appellee to exercise ordinary care for her own safety, and that if she failed to do so, she was not entitled to recover, notwithstanding the failure of duty, if any, of the appellant. Magruder v. Columbia Amusement Co., 218 Ky. 761, 292 S. W. 341. It is true that in the case cited we declined to decide whether proof that the theatre was of standard construction would have altered our ruling that the plaintiff, who had been injured in stepping off an unlighted step leading from the platform on which her seat was placed to the side aisle, was entitled to go to the jury on the issue of negligence. It is at least maintainable that there was more reason for a patron, walking between rows of seats to an aisle by which she had entered, to anticipate the presence of a step-off, than there was for a patron to anticipate a step-off into an aisle on which her seat faced. But, be this as it may, the testimony in the case at Bar shows that there can be no uniform or standard construction of the interior of a theatre balcony, since the length and width necessarily determine the arrangement and elevations of the aisles and seats. This is shown by the testimony of appellant's witness, Morris Fensin, who, for many years, had been engaged in selling theatre seats and directing their arrangement, and who corrected the plans and furnished the seats used in remodeling the theatre in question:

"Q. Is or not this a fact, that the kind of architecture and laying out of plans and building seats and aisles in different theatres depends on the length and width and height, and they cannot all be alike, if they are different width, length and height. A. That's true."

Referring to the absence of a railing separating the cross aisle from the seat platform fronting it, we quote the following from the testimony of the same witness, indicating, not only the absence of standard rules of construction, but that such a railing could have been installed, and that its installation would have added to the safety of the theatre's patrons:

"Q. I say why is a rod put in front of the seats, on the front seat of a balcony? A. Years ago in a theatre if you remember how there used

to be a rod, there would be different prices in every section, between a railing it would be ten cents and another twenty-five cents and that was why they used to make different sections.

"Q. It was a protection to people from falling or stepping off the step? A. That is possible too.

"Q. It is safer, where you have a step seven inches from the floor, and nothing in front, with the lights turned low, to have a rod in front so as to get up by it and get to the aisle and go out? A. So many places they have taken them all out.

"Q. Is it safer to have them? A. No doubt, they are getting away from all railings. You go to big theatres now and the railings are put out and they have put in hat racks."

Neither are we able to agree with appellant's contention that the amount awarded appellee was excessive. Immediately following her injury she was taken to the office of appellant's physician, and by him to an infirmary where she was confined under his treatment for thirteen weeks. According to the undisputed testimony, her pelvis was fractured in three or four places. She collapsed from a blood clot or embolism resulting from the fracture; suffered great pain, and, at the time of the trial was compelled to use a cane for support in walking; and will continue to suffer pain for an indefinite period. The fact that the fracture knitted satisfactorily and no shortening of the limb resulted does not militate against the fact that the injuries were very serious, and necessarily resulted in great agony of mind and body.

Another contention of appellant, which we are compelled to deny, is that an affidavit of one of the jurors, filed by appellant, and ten counter-affidavits, filed by appellee, supported the allegations contained in the motion for a new trial that the verdict was flagrantly against the evidence and rendered in disregard of the evidence and the instructions of the Court. The affidavit filed by the appellant was to the effect that at the beginning of their consideration of the case all of the jurors expressed the opinion that appellee was not entitled to recover under the evidence and instructions, but that several of the jurors had stated that appellant carried liability insurance, and ten of them agreed upon a verdict in appellee's favor for $5,000. In their counter-affi-

davits, the ten jurors who signed the verdict denied that they had been influenced by the knowledge, which, if not assumed, had reached them in some undisclosed way, that appellant carried liability insurance, and set forth in substance that the ten jurors who signed the verdict did not doubt appellant's right to recover but were unable to agree upon the amount which she should be awarded until after the jury, in charge of the Sheriff, had inspected the balcony during the showing of a film, and seen one of the jurors inadvertently step off of the platform into the cross aisle. Several of them were in favor of awarding her a much larger sum than that finally agreed upon. Admitting that the affidavit filed by them was not competent to impeach the verdict on the ground of misconduct (Smith's Adm'r v. Middlesboro Electric Company, 164 Ky. 46, 174 S. W. 773, Ann. Cass. 1917A, 1164), appellant's counsel argue that the counter-affidavits filed in support of it were competent for that purpose and show that the jury applied the doctrine of Comparative Negligence and were influenced by the fact that appellant was insured. But the affidavits, which are too lengthy to set forth, when analyzed, do not sustain this contention; and if they are susceptible to the construction placed upon them by appellant's counsel, they were not competent as impeaching evidence. The case of Drury v. Franke, 247 Ky. 758, 57 S. W. (2d) 969, 88 A. L. R. 917, relied upon by appellant's counsel does not support a contrary rule.

The only ground upon which appellant seeks a reversal in which we find any merit is that the Court erred in including among the items of special damage recoverable "not exceeding $130.00" "for reasonable help in keeping house, necessarily incurred".

The inclusion of this item in the instructions was improper because there was no evidence that the appellee had expended any money or incurred any indebtedness or liability for help in her housekeeping. On the contrary, during her disability, the household chores were performed by her unemployed son-in-law, who, with his wife, resided with her and stayed at home while his wife was employed at a dry goods store. We are aware that expressions may be found in former opinions indicating that this Court will not compel a successful litigant to remit a portion of an excessive verdict for compensatory damages as an alternative to a reversal.

However, we have frequently eliminated from judgments improper items of recovery where the exact amount thereof was ascertainable from their language or by calculation. Chesapeake & Ohio Railway Co. v. Meyers, 150 Ky. 841, 151 S. W. 19; Fraize, Clerk, et al. v. Commonwealth, Ky., 30 S. W. 1014; Prudential Insurance Co. v. Alsobrook, 266 Ky. 442, 99 S. W. (2d) 210. Hence, we perceive no reason why we should not eliminate from a verdict the amount of an item of special damages improperly included in the Court's instructions, even though the jury has made no specific reference to it. It is true that in the case at bar we cannot say that the jury included in the damages awarded appellee any portion of the objectionable item, but at least the appellant cannot be prejudiced by our indulgence of the presumption that they did so. The appellee should not be heard to object since the error was invited, at least in part, by her counsel. We have frequently applied the doctrine, De Minimis Non Curat Lex, but the amount here involved is too large to permit of its application. Hence, we must either subject the litigants and the Commonwealth to the expense of a new trial because of the commission of a comparatively minor error, or protect the rights of the appellant and conserve the true interests of the appellee by directing that the amount of the item be deducted from the total of the judgment. Justice delayed is too often justice denied, and we are convinced that every practical consideration demands our adoption of the latter course.

Accordingly, the judgment is reversed with directions to enter judgment for appellee for $4,870 with interest from the date of the original judgment.