## Kentucky Utilities Company v. Woodrum's Administrator.

## Woodrum's Guardian v. Kentucky Utilities Company et al.

## Same v. Sandidge.

(Decided March 6, 1928.)

### Appeals from Lincoln Circuit Court.

1. Electricity.—Those engaged in the business of producing and transmitting electricity must use the highest degree of care and skill known which may be used under the same and similar circumstances not to injure other persons who may come in contact with the wires while following their business and calling, but electric companies are not liable as insurers for all injuries which may be caused by the operation of their business.

2. Electricity.—Where decedents and plaintiff, with consent of their landlord, cut down a tree which in falling struck and broke an electric transmission wire, and in attempting to move wire decedents were killed and plaintiff was injured by the electric current, held that, in absence of evidence showing that wire would have broken but for the falling of the tree, there was no evidence to go to jury on question whether faulty construction or maintenance of wire caused the accident.

3. Electricity.—In view of evidence that it is proper practice to reclose automatic oil switch after it has kicked out because of overloading of electric transmission line, without investigating cause of its opening, reclosing of such switch which had opened on breaking of transmission wire struck by falling tree cut down by decedents and plaintiff, resulting in decedents' death, and injury to plaintiff by coming in contact with the current, held not negligence for which company or its engineer, who closed switch, were liable, in absence of notice that reclosing of switch would probably cause injury or facts from which such notice could be inferred.

4. Electricity.—Electric company was not a trespasser in occupying public road of county with its poles and transmission wires.

5. Electricity.—If electric company erected and maintained its wires over another's land with his knowledge, it became a licensee, and

the landoner might have a cause of action against it based on en
croachment.

6.  Electricity.—Tenants, who with landlord's permission cut down
    tree on their premises, which in falling broke electric transmis-
    sion wire passing along highway in front of their premises
    were not trespassers, where they did not intend that tree should
    fall and break wire.

GORDON & LAURENT and K. S. ALCORN for Kentucky Utilities
Company and Geo. Sandidge.

J. S. OWSLEY and L. L. WALKER for W. T. Woodrum's Adm'r,
Arville E. Woodrum's Adm'r, and William Woodrum's Guardian.

OPINION OF THE COURT BY JUDGE LOGAN—Reversing
in part and affirming in part.

These five appeals involve three cases that were in-
stituted in the Lincoln circuit court. They were tried
together in that court, and will be disposed of by one
opinion. W. T. Woodrum and A. E. Woodrum were
killed as the result of coming in contact with an electric
wire running from Stanford to Hustonsville. Willie
Woodrum was injured by coming in contact with the
same wire. The defendant in each of the suits instituted
was the Kentucky Utilities Company and George San-
didge, an engineer of the company. Marcus Moore, as
administrator of William T. Woodrum, recovered a
judgment against the Utilities Company for $2,000, and
as administrator of Arville E. Woodrum he recovered a
judgment for $3,000. In the case of Willie Woodrum
against the same defendants, the judgment was in favor
of both defendants. In the other two cases there was a
judgment in each case in favor of George Sandidge. The
Kentucky Utilities Company has appealed from the $2,-
000 judgment in favor of the administrator of William T.
Woodrum and from the $3,000 judgment in favor of the
administrator of Arville E. Woodrum. Willie Woodrum
has appealed from the judgment in favor of the Ken-
tucky Utilities Company and George Sandidge, and the
administrator of William T. Woodrum and Arville E.
Woodrum has appealed from the judgment in each case
in favor of George Sandidge.

On the 3d day of April, 1926, William T. Woodrum
and his two sons, Arville and Willie, were living on the
farm of William Fields in Lincoln county in a tenant
house. The farm was occupied and under the manage-
ment and control of Marcus Moore. The farm was lo-

cated at the junction of the Stanford and Hustonsville highway with the Milledgeville highway. In the yard of the premises where the Woodrums resided, there was a tree partly decayed, near the house where they lived.

They obtained the consent of Marcus Moore to cut the tree for firewood. They undertook to fell the 'tree parallel with the electric wires running along the Hustonsville highway in front of the premises and between the house and the electric wires. When the tree fell, a branch of it struck the electric wire nearest to the house and broke it. There were two wires strung on the poles distant from each other about 27 inches. It is not disputed that the falling of the tree was the cause of the breaking of the wire. When the wire broke, it did not fall to the ground, but sagged to within about 3 feet of the ground. The wire broke at a point just beyond a tree to which was attached a bracket and the breaking allowed the wire to slide through the bracket as the wire sagged until the broken end of the wire was caught in the bracket. The north wire of the transmission line came in close proximity to the tree to which the bracket was attached. The wire had come in contact with the tree frequently and to such an extent that a notch had been burned in the tree, which had from time to time interrupted the service of supplying electricity. The utilities company introduced evidence, however, to show that the condition of the wire in relationship to the tree had been remedied about two years before the accident by attaching a bracket to the tree and placing thereon an insulator and fastening the wire to the insulator with another wire. It is made to appear that the north wire was so attached to the bracket on the tree at the time of the accident. As we understand from the record, the wire broke at a point about 6 inches east of a pole, which stood approximately 77 feet from the west line of the house in which the Woodrums lived. This pole was located a little more than 10 feet beyond the tree to which the bracket was attached. The wire broke at a point a little more than 10½ feet beyond the tree to which the bracket was fastened. The tree which was cut by the Woodrums stood something more than 14 feet from the transmission line, or rather from a point directly under the transmission line.

The only persons present at the time of the breaking of the wire were William T. Woodrum and his son Arville E. Woodrum, who were killed, Willie Woodrum,

who was injured, and Milford Moore. When the wire sagged, Willie Woodrum took hold of it and pulled it out from under the branches of the tree and laid it on top of some of the branches of the fallen tree. He also took a part of the wire to a post and laid it upon the post, thereby taking up some of the slack in the wire. At the time Willie was handling the wire, his father was trimming the fallen tree. The father walked under the wire and took hold of it before Willie laid it on the post. Milford Moore walked with Willie Woodrum to the post, and, while they were standing there, they heard the father, William T. Woodrum, fall. Both of his sons ran to him and seized hold of him in an effort to pull him away from the wire with which he was at the time in contact. William T. Woodrum was instantly killed, and when Arville took hold of him he was likewise killed. Willie, the other boy, was thrown back by the force of the electric shock. There was probably a space of four or five minutes from the time when the wire was first handled until the father came in contact with it and was killed. It seems self-evident that when William T. Woodrum first took hold of the wire as he passed under it and when Willie Woodrum handled it it is was not charged with electricity. It was charged with electricity when the father came in contact with it the second time. Ordinarily the mere breaking of the wire does not take from it its energy, but the voltage fails to flow until a circuit is formed by something coming in contact with it to complete the circuit. If the wire had not been de-energized when it was broken, we see no reason why the first person to touch it would not have been killed. The probabilities are that the broken wire came in contact with the other wire, and that the line was de-energized through the working of an automatic oil switch located at the Standford plant. An oil switch operates automatically, and is in the nature of a fuse, which blows out whenever there is an "overload" of electricity on the circuit. When an "overload" is thrown on the circuit, the switch "kicks" out.

In the instant cases it was shown by the evidence that there were several switches on the board at the Stanford plant. There were separate switches for the separate lines and a main switch which affected all of the lines. If the switch of a particular line kicked out, it affected only that line, but, if the main switch kicked out, it affected every line going through the plant. It was es-

tablished by the testimony that the main switch kicked out at the time of the breaking of the wire on the occasion in question. Sandidge, the engineer at the plant, was in the office. A pilot light in the office in the plant indicates that the electric current is flowing through the transmission lines, but, when the pilot light goes out, it indicates that the current is not flowing through the transmission lines. Sandidge received a telephone message from the office of the utilities company out in town informing him that the lights were out in the city. He then observed that the pilot light was out. He went from his office to the switchboard immediately and discovered that the main switch had kicked out. The switch is closed by throwing it back in place, and, when it is thrown into place, it restores the current on the transmission lines. When Sandidge had thrown the switch into place, he returned to his office, and within a very short time he was again directed by some one not disclosed to cut off the power as two men had been killed. He opened the main switch, thereby cutting off the power on all lines.

It is a necessary inference that the breaking of the line caused the main switch to kick out, thereby stopping the current on all lines. It was during the brief interval that the current was off that the line was handled first by William T. Woodrum and then by his son, Willie. The switch was then thrown into place by Sandidge, thereby restoring the current at the very time when William T. Woodrum took hold of the wire.

Suits were instituted, and the petitions alleged three grounds of negligence: (1) That the transmission line was defectively constructed and not properly maintained. (2) That the act of Sandidge in reclosing the switch without investigating the cause of the overload which was the reason for the kicking out of the switch was negligence. (3) That the utilities company was a trespasser on the premises and on the highway, because the line extended partly over the property line of the Woodrum's place, and because the company had no lawful right to maintain its line along the highway.

It is suggested by counsel for the utilities company that it was not the owner of the transmission line and probably not rseponsible for the accident in any event. Since the company does not insist on the point, however, we shall not state the reasons for its contention. Counsel admit that, under the authority of Thomas v. Maysville

Gas Co., 108 Ky. 224, 56 S. W. 153, 53 L. R. A. 147, 21 Ky. Law Rep. 1690, and subsequent cases, a company generating electricity is responsible for the proper construction and maintenance of the electric lines in public places through which its current passes, regardless of the question whether it owns such lines or has any control over them. We are content to accept the statement of counsel for appellant on this point, and leave the matter as we find it.

. It has been often held by this court that one who is engaged in dealing in electricity must exercise the highest degree of care and skill known in the operation of its business to prevent injury to persons at any place where they have a right to be for either busiiness or pleasure. Electricity is a deadly agency, and its presence cannot be detected by any of the senses other than touch, and, after its discovery, it is too late to avoid the fatal or injurious consequences. The public does not understand much about electricity, and even the greatest scientists know very little about it. They have found out what will happen when certain conditions exist, but they are at a loss to know just why they happen, and it is not in every instance that science can explain what has happened after it has taken place other than by conjecture and speculation. That those who manufacture or use electricity must use the utmost care to conduct their business in such a manner as not to injure other persons who may come in contact with the deadly wires while such other persons are following their business and calling is well settled. The utmost care and skill required of those engaged in the business of producing and transmitting electricity is the highest degree of care and skill known which may be used under the same or similar circumstances. Among the cases defining the degree of care and skill required of those engaged in producing and transmitting electricity are Louisville Gas & Electric Co. v. Beaucond, 188 Ky. 725, 224 S. W. 179; Paducah Light & Power Co. v. Parkman's Adm'r, 156 Ky. 197, 160 S. W. 931, 52 L. R. A. (N. S.) 586; Smith's Adm'x v. Middlesboro Electric Light Co., 164 Ky. 46, 174 S. W. 773, Ann. Cas. 1917A, 1164; Lexington Ry. Co. v. Fain (Ky. Sup.) 71 S. W. 628, 24 Ky. Law Rep. 1443.

While it has become a part of the established law in this state that those engaged in the business of producing and transmitting electric current must use the utmost

care and skill to prevent injury to those who are engaged in their respective businesses or pleasures, yet it has never been held by this court that those producing and transmitting electricity are insurers against all injuries which may be caused by the operation of their business. Those who deal in this deadly, unseen instrumentality must exercise the utmost care and skill which may be known. They must know the combined experiences of those engaged in the same or similar business, and they must make use of such experiences for the protection of the public. All that the ingenuity of man has devised for the protection of the public against the dangers caused by those producing and transmitting electricity must be brought into play and made use of, if experience has shown that they will prevent or tend to prevent injuries to the public who rightfully may expect protection.

In this case we are called upon to determine whether the Kentucky Utilities Company used the utmost care and skill known by it, or by those engaged in the same or similar business, in the protection and transmission of the current which caused the death of two of the Woodrums and injured a third.

It is charged in the petition, and argued in the brief, filed in behalf of the administrator of the Woodrums deceased and the other Woodrum, that the Kentucky Utilities Company was guilty of negligence in generating electricity and transmitting it over the wire which broke because the wire was weak and defective and not properly constructed and maintained. The voltage transmitted over this wire was 6,600. The limb of the tree which struck the wire was a small limb, according to the testimony of Willie Woodrum. He said the limb which struck the wire was a little bigger than the arm where it left the tree, and at the point where it struck the wire it was about the size of a thumb. The tree which was cut was rotten on the side next to the house, and was about 18 inches in diameter. The span between the poles at the house where the accident occurred contained two poles, one at each end of the span. These poles were of standard height, and we find no complaint about any defect in the poles. There was a cross-arm on each pole, and each cross-arm had two glass insulators 27 inches apart. The wires were of bare copper, and were attached by tie wires

to the insulators on the cross-arms. The copper wires were the standard used for that particular kind of construction. There is no complaint about the spacing between the wires. There was a splice in the wire about 18 inches from one of the poles which had been there several years, but the wire did not break at the splice. The break was about one foot from the splice. A notch had been burned by the wire in the tree above mentioned to which a bracket was attached, but the defect in that respect had been corrected two years before the accident. There seems to be no evidence that the wire was weakened by reason of its having come in contact with the tree. Witnesses testified that a short while prior to the accident they had seen the tree burning where the wire came in contact with it. But, if the wire did not break at that point, there must be other evidence of faulty construction or maintenance. The evidence must be considered as it relates to the span between what was referred to in the evidence as Pole A and pole B, and such other evidence as may show a faulty construction elsewhere, which, by reason of some relationship of the faulty construction elsewhere to the particular span in question, the span was also rendered faulty in construction or maintenance. There was evidence that the wires had been broken and spliced at several places; that there were trees through which the wires ran. There was no insulation on the wire, and this was shown by the evidence, but it is well established that wires carrying a high voltage cannot be successfully insulated.

In the case of Illinois Central Railroad Co. v. Cash's Administratrix, 221 Ky. 655, 229 S. W. 590, the court said:

"It is well settled that negligence is never presumed; it must be proven. Either the direct acts of negligence must be shown by the proof or such facts must be established by the proof from which negligence is inferable. All facts and circumstances established by the proof in support of the negligence alleged must be considered in determining whether direct acts of negligence have been established, or, if not so established, whether the facts and circumstances are such as render it reasonably apparent that negligence must be inferred."

This is the rule deduced from many cases cited in support of the foregoing quotation. Further in the same case it was said:

"The fact that a defendant has been guilty of negligence followed by an accident does not always mean that the defendant is liable for the resulting injury. The resulting injury must have been occasioned by the negligence. It is the breach of some duty to the plaintiff which renders ·the defendant responsible to him for any resulting injury."

A number of cases are cited supporting the principle announced in this quotation.

When we consider all of the evidence, we cannot escape the conclusion that the proof fails to show that negligence on the part of the utilities company was responsible for the· death of William T. Woodrum and .Arville E. Woodrum and the injury to Willie Woodrum.

On this point it would be exceedingly difficult to distinguish these cases from the case of Cundiff v. City of Owensboro, 193 Ky. 168, 235 S. W. 15. In that case a man driving a wagon loaded with tobacco along a street in the city of Owensboro came in contact with a defective electric line pole maintained by the city. The impact broke the pole and it fell on the wagon, causing the team to run away, thereby inflicting injury on the driver. The driver sued the city to recover damages. This court held in that case that the defective condition of the pole was not the proximate cause of the injury. The court admitted that the question as to what is the proximate cause of an injury is generally a question of fact triable by a jury, but held that, where the facts are admitted only a question of law remains. There is nothing in the evidence in the instant cases to show that the wire would have broken but for the falling of the tree, and the falling of the tree was the voluntary act of those who received their death because of the breaking of the wire. The question of negligence based on the ground of faulty construction or maintenance of the wire should not have been submitted to the jury, as there was no evidence to take the case to the jury on that point.

But it is insisted by counsel for the administrator of William T. Woodrum that the act of Sandidge in reclosing the oil switch before ascertaining the probable consequences of that act was negligence. If the evidence on this point shows that the utilities company exercised the

utmost degree of care and skill, that is the highest degree of care and skill known, which is used, or may be used, by others engaged in the same or similar business under the same or similar circumstances, and, if there is no conflict in the evidence on this point, the lower court should have held that as a matter of law the utilities company had not failed in the performance of its duty.

Prof. O'Bannon testified against the contention of the utilities company, and an analysis of his evidence should lead to a conclusion as to whether there was a conflict in the evidence on this point. He was questioned as to whether it was proper practice to reclose the oil switch without investigation after it had kicked out, and his statement was that from the point of view of efficiency it was proper practice to reclose the switch, but he volunteered the opinion that, in his judgment, the practice was an absolute disregard of the safety of the public. He made his position clear when he stated:

"I think this, that if any company is to sacrifice safety for practical economic operations, then they should be willing to bear the burden of expense, damages, or anything else resulting from their lack of care and skill in constructing their line safely."

Further he said:

"In other words, my idea is that, if the company wants to in any way run the chances, which may be one in a thousand, of electrocuting somebody, that if they want to run that chance, and not make the—not make the equipment absolutely safe so that there wouldn't be any chance of electrocuting anybody, then they run that chance for the purpose of economic gain, and under that consideration they ought to be willing to pay for any damages which would occur due to their negligence to safeguard the public."

The testimony of Prof. O'Bannon clearly disclosed that he was of the opinion that those engaged in the production and transmission of electricity should be held to be insurers against any injury to the public. An examination of the cases cited above and other opinions of this court will show that we have never held that those so engaged are insurers, and to so hold at this time would mean a change in the settled law of this state.

Moreover, we find this statement in the brief of counsel representing the administrator and Willie Woodrum:

"We submit that, if the electric companies are going to be permitted to inaugurate policies and practices to turn on these switches and thus shoot in the dark, where there is a possibility, if not a probability, that some person along the highway, or on their own premises, will be electrocuted and killed, they should be required to pay the damages resulting from this act."

This is also an argument that such companies should be held to be insurers, and to so hold would mean that we must depart from the decisions which hold that only the utmost degree of care and skill is required of them. Of course, if such a company had notice that the reclosing of the switch would probably do injury to some one, it would be negligence to reclose it, and such notice might be inferred from circumstances and physical conditions, but there is nothing in the evidence in the instant cases to show that the company should have foreseen the probable injury and death to the Woodrums when Sandidge reclosed the switch. Such companies are required to exercise the utmost care and skill in the maintenance of their lines and to prevent the lines falling or otherwise coming into a position where the public may come in contact with them, and they must exercise the same degree of care to prevent injury at all times and under all circumstances, but no more than that has ever been required by this court. Since the evidence in these cases showed without contradiction that reclosing the switch under such or similar circumstances is a proper practice and so recognized by all those engaged in the same or similar business, we are constrained to hold that the reclosing of the switch by Sandidge was not negligence. We do not mean to hold that the reclosing of the switch might not be negligence under a different state of facts when presented by the evidence. Every fact and circumstance should be taken into consideration in determining whether such an act is negligence, and we are unwilling to say that it was negligence on the part of Sandidge under the facts and circumstances shown by the evidence. If there is some other method which could be followed to ascertain the cause of the kicking out of the switch without going further than to hold such companies under the duty to exercise the utmost degree of care and

skill, there is nothing in this record which would enable us to say that any such other method is known. It is suggested in the brief of counsel for the administrator and Willie Woodrum that it was held in the case of Cundiff v. City of Owensboro, supra, that, if the facts were such that, in the exercise of reasonable prudence, the city should have anticipated that a person traveling the streets would come in contact with the pole and thus put a strain upon it, the city would be responsible to the person receiving an injury by reason of the breaking down of the pole. There is no question about the correctness of that rule. It is also argued by counsel that it was the duty of the utilities company to ascertain that there was a decaying tree standing close enough to the line to endanger the line. That argument would have some force if such a tree had fallen upon the line as the result of its decayed condition, but such is not the case here. The tree fell on the line because of the act of those who were thereafter killed or injured by reason of the falling of the tree on the line.

The proof does not show negligence on the part of the utilities company, and, without the establishment of negligence, at least to some extent, there can be no recovery.

It is suggested by counsel for the administrator and Willie Woodrum that the utilities company was a trespasser, in that it was without right to occupy the public roads of the county with its poles and lines. This argument is based upon the idea that the county has an easement only in the roadway, and that the landowner owns the land embraced in the roadway subject to the easement. Counsel cite us no authority to support the argument, and we are confident neither statute nor decision can be found in this state supporting that contention, this court has held to the contrary. Cumberland T. & T. Co. v. Avritt, 120 Ky. 34, 85 S. W. 204, 8 Ann. Cas. 955, 27 Ky. Law Rep. 394.

It is argued, however, that the wires of the utilities company were over the land belonging to Fields, occupied at the time by Moore and the Woodrums. The evidence on this point is scant and unsatisfactory. One witness stated that he believed that one of the wires was just a little over the yard, although there was no fence between the road and the yard. By actual measurements it appears to have been established that the line was not

over the yard, and this point is not strongly urged by counsel for the administrator and Willie Woodrum. If there was an encroachment, it had existed for some time, as there had been no change in the location of the line for several years. The line was not changed after the Woodrums took possession as tenants. If the utilities company erected and maintained its wires over the property of the landowner with his knowledge, it became a licensee, and the landowner might have a cause of action against the utilities company based on the encroachment. It was so held in Holloway v. Louisville Railway Co., 92 Ky. 244, 17 S. W. 572, 13 Ky. Law Rep. 481. But, aside from all that, there is nothing in this record to indicate that the tree fell on the wire because the wire was over the land of Fields.

Neither do we believe that the Woodrums were trespassers at the time they cut the tree. They were in their own yard, and the tree which they cut grew in their yard. The limb of the tree came in contact with the wire without any intention on their part that it should do so. The case of Mayfield Water & Light Co. v. Webb's Adm'r, 129 Ky. 395, 111 S. W. 712, 18 L. R. A. (N. S.) 179, 130 Am. St. Rep. 469, 33 Ky. Law Rep. 909, can be differentiated from these cases on the facts, as can the case of Rodgers' Adm'r v. Union Light, Heat & Power Co. (Ky. Sup.) 123 S. W. 293, although it is more difficult to differentiate the last-mentioned case from the instant cases than it is the Mayfield Water & Light Co. case.

Upon the whole case we have reached the conclusion that the case of Kentucky Utilities Co. v. Marcus Moore, Administrator of William T. Woodrum, and the case of Kentucky Utilities Co. v. Marcus Moore, as Administrator of Arville E. Woodrum, should be reversed, and the causes remanded for proceedings consistent with this opinion. The judgment in the case of William Woodrum's Guardian v. Kentucky Utilities Co., and George Sandidge, and the case of Marcus Moore, Administrator of William T. Woodrum v. George Sandidge, and the case of Marcus Moore, Administrator of Arville E. Woodrum v. George Sandidge, should be affirmed, and it is so ordered in each case.

Whole court sitting.

### Dissenting Opinion by Judge McCandless.

The break in the wire was caused solely by the falling tree. A's the Woodrums cut the tree, it cannot be said that any negligence in the construction or maintenance of the power lines was the proximate cause of the injury. Also for reasons appearing later the Woodrums were guilty of contributory negligence in knowingly and intentionally handling a transmission wire, and cannot recover for injuries resulting therefrom. I therefore agree with the result of the majority opinion. But I am unable to say as a matter of law that the practice upon the part of the power company of readjusting the alignment at its plant when the circuit breaker "kicks out" by closing the switch before making an investigation; and thereby transmitting a high-powered current through its lines over highways and private premises, is the exercise of the highest or utmost degree of care.

Admittedly the use of electricity has become a necessity, and the public is demanding service and desires this at reasonable rates. Also private companies who operate power plants are entitled to a profit. Further it may be assumed that it is impracticable to place the wires under the ground, and in towns and cities and along public highways it is impossible to avoid all contact with trees and other obstructions; and that two transmission lines, one of which could be used when the other is in trouble, may be impracticable on account of prohibitive cost. Also I am willing to concede that under the proof in this case any trouble over a line which causes a short circuit or adds a load to the line will cause the circuit breaker to "kick out" and shut off the power, and that the operator cannot locate the trouble except by patrolling the line; that these troubles occur frequently and for the most part by minor and harmless interferences, and that, if the operator had to investigate the cause of each of them before restoring the current, the public service would be much disturbed. But the fact remains that the release of the circuit breaker signifies trouble. It may or may not mean "danger," but gives notice of probable danger, and is the only warning of danger provided by the company. And, whatever may be the economic necessity of closing the switch to give a constant and continuous service, I can but place human life above the demands of commerce. If power companies, either for private gain or to supply the public demand for adequate service, and because the fatalities

are few, insist upon ignoring the warning of probable danger on the ground of public service and economic efficiency or necessity, and thereby electrocute unwary and innocent victims, then they and the general public through them should pay the injured persons the economic loss suffered thereby. It is no argument to say that all companies are doing the same thing or that modern science has not discovered any safer or more practical device. Admittedly the circuit breaker functions properly, but, if its warnings are ignored, its purpose is frustrated, and the company takes the risks and should bear the consequences, regardless of custom which can never justify a legal wrong. Suppose a transmission wire falls upon my premises or upon the highway, and the circuit breaker, giving notice of trouble and it is adjusted. I am traveling at night and without notice or warning come in contact with the wire, and my life is extinguished. Can it be said that the operator owes me no duty; that he is not negligent; that my life must be sacrificed and the economic loss must fall on the injured person instead of the one perpetrating the injury? The question carries its own answer.

The majority opinion temporizes with this phase of the question, but seems to intimate that *persons rightfully* upon premises or upon public highways traversed by transmission lines may be classified, and that it would be negligence as to some of them to close the switch but not as to others dependent upon the circumstances of the case. I cannot grasp this distinction. Negligence is a breach of duty, and, if the duty exists at all, it should apply generally to all who are rightfully using such premises or highways. In this case it is evident that when the wire broke it came in contact with the companion wire, formed a short circuit, and the circuit breaker "kicked out." When the switch was closed, the wire was re-energized, but this did not cause a second kick-out. There was nothing at the power plant to give further notice of this condition, and this could not be discovered except by patrolling the lines or by information from its customers or some passerby of such condition. The wire may have remained indefinitely upon the post where Willie Woodrum placed it and where young children purposely or others inadvertently might come in contact with it, and, if this had occurred and death or injury resulted, could it be said that the utmost degree of care had been exercised? Of course no duty is owing

.to a mere trespasser who climbs a pole or knowingly dislodges or breaks down a wire and is injured in so doing, but, as to all persons properly and innocently enjoying such premises and highways, the company is under the duty of refraining from so using its property. It is said that, if this rule should be adopted, every one injured by loose transmission wire would claim that he relied on the current being cut off and that the company would not only be held to be an insurer, but that the plea of contributory negligence would be practically eliminated. Not so; a broken wire will not cause the circuit breaker "to kick out" except in case of a short circuit, and ordinarily the end of the wire attached to the power plant remains energized; hence every one is chargeable with notice that contact with a transmission wire is dangerous even though it is sagging or broken, and any one who knowingly and voluntarily makes such contact is guilty of negligence; hence the company can always rely on contributory negligence in a proper case.

Again the expression "insurer" is inaccurate. The doctrine for which I am contending only requires such company to indemnify the injury or loss occasioned by its affirmative act in re-energizing its lines after it has actual warning of probable danger—a clear failure to exercise the utmost care—and leaves open all the defenses applicable to negligence cases; though, if this rule makes it an insurer, then it is justified on the principle above advanced that, if society demands the sacrifice, it should indemnify the sufferer. I therefore respectfully dissent from the reasons given by the majority opinion for its conclusions, and am authorized to say that Justices Dietzman and Willis concur herein.