NOT RECOMMENDED FOR FULL TEXT PUBLICATION
File Name: 07a0439n.06
Filed: June 22, 2007

Case No. 06-5769

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| JOANN MATILLA, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| Plaintiff-Appellant, | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| v. | ) | KENTUCKY, LONDON DIVISION |
| | ) | |
| SOUTH KENTUCKY RURAL | ) | |
| ELECTRIC COOPERATIVE CORP., | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

BEFORE: MOORE and GIBBONS, Circuit Judges; and SARGUS, District Judge.[*]

SARGUS, District Judge. Plaintiff-Appellant, Joann Matilla, appeals the decision of the district court granting summary judgment in favor of Appellee, South Kentucky Rural Electric Cooperative Corporation ("SKRECC"). The district court found that the acts of two individuals were a superseding cause of Matilla's injuries which she sustained when she was struck by a 7,200 volt electric wire that was owned and operated by the Electric Cooperative. Because we conclude that Matilla has not established that SKRECC owed her a duty to de-electrify the line, we affirm on alternate grounds.

I.

On February 16, 2004, Appellant, Joann Matilla, suffered serious physical injuries when she

---

[*]The Honorable Edmund A. Sargus, Jr., United States District Judge for the Southern District of Ohio, sitting by designation.

was struck by a power line. Appellee, South Kentucky Rural Electric Cooperative Corporation ("SKRECC"), owned and maintained the power line. At the time of her injuries, Matilla was a citizen of Oregon but was temporarily residing with her then-boyfriend, Michael Pitman. Pitman had been in Kentucky for an extended period of time to attend to the affairs of his mother's estate.

On February 16, 2004, Matilla and Pitman, along with Jeff Gregory and his girlfriend, Bobbie McClure, were cutting trees on the property of Olive Harness.[1] The Harness property is located on Rocky Hill Road, a gravel county road located in Pulaski County, Kentucky. SKRECC services only two customers on Rocky Hill Road, Olive Harness and Patsy Vaught. The Harness property is serviced via a 7,200-volt transmission line which is owned and maintained by SKRECC. The high voltage line traversed Rocky Hill Road across a wooded area along this county road. Matilla was seated in the back of a pick-up truck on Rocky Hill road underneath the power lines.[2]

SKRECC is an electric cooperative. Charges for electricity to the member-customers of SKRECC are calculated by monthly kilowatt usage. If, however, a member uses less than one kilowatt hour per month, no kilowatt charges accrue, but SKRECC charges the customer a minimum monthly payment.

---

[1] The parties vigorously dispute whether Matilla and the others were trespassing or had permission to be on the property for uses such as hunting and wood-cutting. The district court declined to resolve this conflict in the evidence, concluding instead that the questions of foreseeability and proximate cause were dispositive.

[2] SKRECC emphasizes, and the district court mentioned, that Matilla and some of her companions were drinking beer at the time of the incident. The record, however, provides no indication that Matilla was impaired by the "couple of beers" she consumed, or that the alcohol had any relationship to the accident. In any event, the district court did not consider this evidence particularly relevant in arriving at its ultimate conclusions and determined instead that even omitting this fact would not alter its opinion that SKRECC could not have foreseen the chain of events leading to Matilla's injury.

The Harness family became a member of the SKRECC in 1969.[3] After her husband, Elmer Harness, passed away, Olive Harness assumed the account. Olive Harness has recently suffered with Alzheimer's disease. Although Mrs. Harness owns the property along Rocky Hill Road where the accident took place, her affairs are now handled by her niece, Roxie Johnson, who has a full power of attorney.

Virtually no electricity has been consumed at the Harness property since at least 1997.[4] The Harness account, however, has been charged the minimum monthly amount, and the account was current at least through December 2005. Although SKRECC serviced both the Harness and Vaught properties on Rocky Hill Road, power to the Harness property could have been discontinued without affecting service to the Vaught premises.[5] Neither Mrs. Harness nor her caretaker, Mrs. Johnson, ever requested that SKRECC disconnect or terminate the Harness account. Mrs. Johnson specifically averred that, at all times, she intended that electricity be available to the meter on the pole. For many years, Mrs. Johnson paid $5.77 each month to make this electricity available to the

---

[3]Matilla points out SKRECC did not establish that Mrs. Harness maintained a cooperative membership agreement. SKRECC provided an undated application for service signed by her late husband for "10 acres on the west side of Highway 80 . . . ," which, as Matilla contends, does not describe the subject 280-acre property on Rocky Hill Road. SKRECC did not produce a membership agreement signed by Olive Harness.

[4]SKRECC's billing report in June of 1997 indicates that the meter to the property never registered any electrical usage. Pole visual-inspection records from SKRECC indicate that the meter had not reflected electrical usage of more than one kilowatt hour since October of 1998.

[5]Appellant-Matilla's expert, James Geiger, a consulting engineer, inspected the line and noted that the Harness electric meter was energized, but no power was being delivered from this line. He opined that the electricity on the line could have been turned off at the Vaught residence, at the beginning of the road. He indicates that SKRECC could have disconnected the line in approximately five minutes to make it safe beyond the point of disconnection.

Harness property.

On the date of the incident, Matilla, Pitman, Gregory and McClure had already cut down one tree, sawed it into pieces and loaded it into the back of a truck. Pitman and Gregory then attempted to cut down a locust tree. During the process, the locust tree became lodged in an adjacent pine tree. In an attempt to free the locust, Pitman and Gregory cut the pine tree. As the locust fell towards the ground, it struck the power line that ran along Rocky Hill Road. The line struck Matilla, who was sitting in the back of Pitman's truck which was parked directly underneath the power lines on the road. Matilla was knocked off the truck from the force of the electric shock and severely injured.

Matilla filed a lawsuit on August 8, 2004. SKRECC filed a third-party complaint against Michael Pitman and Jeff Gregory. Upon motion of SKRECC, the district court entered default judgment against Pitman and Gregory on January 20, 2006.

The district court issued a scheduling order on November 22, 2004, which required initial disclosures under Federal Rule of Civil Procedure 26 by December 1, 2004. The court set Plaintiff's deadline to disclose the identity of her expert witness to be used at trial and their written reports for June 15, 2005. All pretrial discovery was to be completed by December 1, 2005.

Matilla did not meet the deadline for initial disclosures under Rule 26 by December 1, 2004, which her counsel explained was the result of difficulty in timely obtaining information due to Matilla's ongoing health problems and the fact that she had moved to Oregon. She received a brief extension until January 18, 2005 to provide the required information.

On June 15, 2005, the deadline for Matilla to disclose expert reports, Matilla requested an extension until September 15, 2005 to disclose damage experts. The next day, she disclosed the

report of James Geiger, her liability expert. The court permitted an extension until September 1, 2005 to file additional expert disclosures. On September 1, 2005, Matilla again requested an extension to disclose damage experts. The court gave Matilla until October 1, 2005, and warned her that it was not inclined to give any additional extensions of time. On October 4, 2005, Matilla filed the disclosure of her vocational expert.

On November 15, 2005, SKRECC took the deposition of Matilla's liability expert, James Geiger. On that day, he provided testimony regarding a second, different theory of liability, which followed an additional visit to the scene of the accident on the morning of his deposition. Geiger testified that his second visit to the Harness' property, during which he made "closer observations," which revealed a second hazardous condition. Geiger opined for the first time that the line should have been de-energized because the meter box and outlets created a dangerous condition. SKRECC filed a motion *in limine,* which the district court granted on January 20, 2006, finding that Matilla had been dilatory in the discovery process and Geiger's additional expert opinion had been submitted well outside the time permitted.

The district court entered summary judgment on February 28, 2006. Matilla, through her counsel, filed a motion to amend and vacate summary judgment on March 10, 2006. The district court denied the motion to amend and vacate on May 5, 2006.[6] Matilla brings this appeal from the

---

[6]Matilla herself sent a *pro se* letter to the district court after the judgment, essentially questioning the decision on the motion. (Apx., at 399.) SKRECC recites some of her statements from the letter in their brief in an effort to cast doubt on her competency. (Brief of Appellee at n.2.) These communications are irrelevant to the issues presented to this Court. As counsel for Appellant points out, SKRECC's choice to include the statements is, at worst, "an appalling effort" to take advantage of Matilla's severe impairment that resulted from the incident which is the subject of her case of negligence against the Cooperative.

district court's final judgment.

## II.

The case came before the district court on the basis of diversity of citizenship pursuant to 28 U.S.C. § 1332.[7] This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

We review the grant of summary judgment in favor of SKRECC *de novo*. *Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001); *Lukowski v. CSX Transp., Inc.*, 416 F.3d 478, 482 (6th Cir. 2005). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). A dispute over a material fact is genuine if a reasonable jury could return a verdict for the nonmoving party. *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003). In deciding the propriety of a motion for summary judgment, this Court views all evidence in the light most favorable to the nonmoving party. *Id*. "To survive a motion for summary judgment, the non-moving party must present evidence creating more than a 'metaphysical doubt as to the material facts.' " *Liberty Mut. Fire Ins. Co. v. Massarone*, 326 F.3d 813, 815 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

In this diversity of citizenship case, the district court applied the law of the State of Kentucky. *Erie Railroad Co., v. Thompkins*, 304 U.S. 64 (1938). This Court reviews the application of state law *de novo*. *Theobald v. Board of County Com'rs of Hamilton County*, 332 F.3d 414, 416 (6th Cir. 2003); *Spence v. Miles Laboratories, Inc.*, 37 F.3d 1185, 1188 (6th Cir. 1994).

---

[7]Matilla is a resident of the State of Oregon; SKRECC is a Kentucky entity. The amount in controversy exceeds the sum of $75,000. The events giving rise to Matilla's cause of action arose in Pulaski County, Kentucky.

In diversity cases, the Court applies state law in accordance with the controlling decisions of the state supreme court. If that court has not yet addressed the relevant issue, this Court must predict how the state supreme court would rule by looking at all the available data. *Allstate Ins. Co. v. Thrifty Rent-A-Car Systems, Inc.*, 249 F.3d 450, 454 (6th Cir. 2001). "'Relevant data include decisions of the state appellate courts, and those decisions should not be disregarded unless we are presented with persuasive data that the [state supreme court] would decide otherwise.'" *Id.* (quoting *Kingsley Assoc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 507 (6th Cir. 1995)).

### III.

The district court held that the acts of Michael Pitman and Jeff Gregory were a superseding cause of Matilla's injury and therefore granted SKRECC's motion for summary judgment. Matilla contends that the district court erroneously analyzed the law of superseding cause and misapplied the doctrine to the facts of this case. We review the grant of summary judgment *de novo* and may affirm on any grounds supported by the record. *City Mgmt. Corp. v. U.S. Chem. Co., Inc.*, 43 F.3d 244, 251 (6th Cir.1994). Although we do not address the district court's decision finding a superseding cause, we affirm on the basis that Matilla has not established that SKRECC owed her a duty to de-electrify the line.

To establish a claim for negligence under Kentucky law, a plaintiff must prove each of the following elements: (1) the defendant owed the plaintiff a duty of care; (2) the defendant breached that duty; and (3) the breach caused the plaintiff's damages. *Mullins v. Commonwealth Life Ins. Co.*, 839 S.W.2d 245, 247 (Ky. 1992). As the district court noted, neither party contests the fact that Matilla suffered severe injuries as a result of physical contact with the high-voltage electrical wire.

The district court also did not address whether SKRECC breached a duty of care owed to Matilla, because this question would be for a jury to resolve. Thus, the district court limited its analysis to the remaining elements, specifically the duty of care owed to the Plaintiff and legal causation.

The question of whether SKRECC owed Matilla a duty of care turns on a two-part inquiry, the standard for which derives from the seminal case, *Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99 (N.Y.1928). The Court must first examine the standard of care that SKRECC owed to Matilla in the operation of its electrical distribution lines. Next, the Court must determine whether the cause of Matilla's injury was foreseeable by SKRECC. *See James v. Meow Media, Inc.*, 300 F.3d 683, 691 (6th Cir. 2002)(interpreting Kentucky law as it relates to determinations of whether a duty of care exists). Kentucky courts have concluded that deciding the existence of a duty of care is "essentially a policy determination." *Mullins*, 839 S.W.2d at 248; *Sheehan v. United Servs. Auto. Ass'n*, 913 S.W.2d 4, 6 (Ky. Ct. App.1996). Under Kentucky law, both the existence of a duty of care to a plaintiff and its underlying foreseeability are pure questions of law to be decided by the court. *Meow Media,* 300 F.3d at 691 (citing *Mullins*, 839 S.W.2d at 248).

Kentucky law imposes a duty on entities producing and transmitting electricity to "exercise the highest degree of care and skill known in the operation of its business to prevent injury to persons." *Kentucky Utilities Co. v. Woodrum's Adm'r*, 224 Ky. 33, 38, 5 S.W.2d 283 (Ky. 1928). That duty, however, is not absolute; Kentucky courts have never held that electric utilities are insurers against all injuries which may be caused by the operation of their business. *Id*. at 286. A utility company owes this extremely high standard of care only to a person "at any place where they have a right to be for either business or pleasure." *Id.*

As to the standard of care that SKRECC owed to Matilla, the district court noted, and this Court agrees, that in the present case, the evidence conflicts concerning whether Matilla and her companions were trespassing on the Harness' land or whether she had permission to be on the property for purposes such as clearing trees. Given this variance in the facts, the Court cannot determine whether SKRECC owed Matilla the highest degree of care and skill in the distribution of its electricity, or the more general reasonable care under the circumstances. This issue, however, is not dispositive. It is undisputed that SKRECC owed some degree of care to Matilla in the maintenance of its energized power lines, whether she was on the Harness' premises without permission, or, as she contends, on a public road. "'[D]uty' is a question of whether the defendant is under any obligation for the benefit of the particular plaintiff; and in negligence cases, the duty is always the same– to conform to the legal standard of reasonable conduct in the light of the apparent risk." Prosser and Keeton on Torts (5th ed. 1984), § 53 p. 356. In its practical application, even if the electric cooperative was obliged to provide Matilla only an ordinary duty of care, considering the proportionately dangerous character of electricity, SKRECC still owed her, and the public at large, a relatively high degree of care to reduce potential hazards.

The scope of the duty owed by SKRECC to de-energize the overhead power line is a question of foreseeability. The existence of energized power lines does not create a foreseeable risk with respect to every potential plaintiff who may suffer injury by coming into contact with those lines. In this case, Matilla's expert, James E. Geiger, identified the hazard as "the presence of electrical energy on the unused line." (JA at 60.) Geiger opined that "[b]ut for allowing an unused electrical line to remain energized," Matilla's injury could not have occurred, and that SKRECC's failure to

de-energize the unused line was a substantial factor in her injuries. Thus, Matilla's sole theory was that SKRECC had a duty to de-energize the line and that such a duty arose from the fact that the line was abandoned. Geiger's ultimate opinion was that the highest degree of care required SKRECC to disconnect the jumper line at the residence. In the event that a customer sought to re-establish service, according to Geiger, it would have required approximately five minutes for SKRECC to re-connect the line to the residence.

Geiger based his opinion upon the regulations set forth in the National Electrical Safety Code ("NESC"), promulgated by the Institute of Electrical and Electronics Engineers, Inc.[8] These regulations provide that "[l]ines and equipment permanently abandoned shall be removed *or maintained in a safe condition*." NECS § 21:214(B)(3)(emphasis added). The NESC allows for lines to be either removed or maintained in a safe condition. Other than the fact that the line was energized, Geiger's written report offered no other opinion that SKRECC's equipment was defective or that the power line was otherwise unsafe. Thus, even if the line could be considered abandoned, Matilla has not shown that such abandonment required SKRECC to de-energize it.

In this case, the record discloses that the customer's intent was to maintain the availability of electricity to the Harness' property. Because Mrs. Harness suffered from Alzheimer's disease, her business concerns were managed by Ms. Johnson who was given a power of attorney to act on Harness' behalf. Johnson testified that, at all times, she intended that electricity be available to the

---

[8]Kentucky courts have held that an electric company's compliance with safety standards does not, in and of itself, free the company of negligence. *Lambert v. Franklin Real Estate Co*., 37 S.W.3d 770 (Ky. App. 2000)(citing *Vaught's Adm'x v. Kentucky Utilities Co.*, 296 S.W.2d 459, 462 (1956)). The Court, therefore, does not conclude that compliance with the NESC-regulatory scheme absolves SKRECC of liability or that the regulations establish the amount of care required under the circumstances.

Harness' property. SKRECC's accounting records reflect that the minimum member charge had been billed and paid, and that the account was current at the time of the district court's decision. Neither Mrs. Harness nor anyone on her behalf had ever requested SKRECC to disconnect or terminate the account.

Matilla asserts that the line to the Harness' property was abandoned, and that service should have been terminated, because SKRECC had knowledge that the particular line served no electrical load and registered no kilowatt usage. A utility undertaking to provide electricity to the public in Kentucky, however, must supply adequate service to all persons in that area who desire it, and is restricted by the state Public Service Commission with respect to the ability to terminate service:

> A utility may refuse or terminate service to a customer only under the following conditions except as provided in subsections (2) and (3) of this section: (a) [f]or noncompliance with the utility's tariffed rules or commission administrative regulations ... (b) [f]or dangerous conditions ... (c) [f]or refusal of access ... (d) [f]or outstanding indebtedness ... (e) [f]or noncompliance with state, local or other codes ... [and] (f) [f]or nonpayment of bills.

807 Ky. Admin. Regs.5:006, § 14 (2006). Notably, this list of permissive bases for termination of electric services does not include abandonment. Indeed, "[a] utility shall not terminate service to a customer if the following conditions exist: (a) [i]f payment for services is made. . . ." 807 Ky. Admin. Regs. 5:006, Section 14(2).

Matilla's theory is premised entirely on Geiger's report, which found that the line had been abandoned, because no electrical load was attached to the Harness' equipment and that the account history showed no kilowatt usage for several years. Neither of these conditions is a permissible basis under the Public Service Commission's regulations upon which SKRECC could have terminated service to the Harness' property, particularly in light of the fact that regular monthly payments were

made for membership fees to keep the account active.[9]

Matilla did not timely present evidence that the Harness power line was unsafe or that service was otherwise properly subject to termination under Kentucky regulations. Late in the litigation, however, Matilla sought to introduce additional expert evidence and testimony related to a different hazard and theory of liability. During his November 15, 2005 deposition, Geiger opined for the first time that the line should have been de-energized, because the meter box and outer apparatuses created a safety hazard, an opinion he had not reduced to writing. The district court excluded the evidence on the grounds that it was not timely disclosed before the deadline for supplementing

---

[9]Matilla relies upon *Styles v. Eblen*, 436 S.W.2d 504 (Ky. 1969) to support her argument that SKRECC's continued maintenance of its energized lines under the circumstances constitutes negligence. Matilla contends that *Styles* stands for the proposition that SKRECC was under a duty to de-energize a line that is not serving a useful purpose. *Styles*, however, did not involve a claim against a utility company that serviced the public. Rather, *Styles* addressed the liability of a property owner who owned and maintained its own power lines. The property owner owned both the equipment through which the electricity flowed and controlled the delivery of the electricity on the overhead power lines. *Id.* at 504-05.

In *Styles*, a number of livestock were electrocuted when a dead tree fell on the power lines during a windstorm. The plaintiff successfully argued that the property holder had a duty to de-energize the power lines because the lines had not been used for approximately two years and served no useful purpose. The *Styles* court reasoned that the property owner's failure to de-energize its lines constituted negligence because the power lines were constructed solely to supply power to oil recovery pumps. When the recovery operation ceased, the pumps were dismantled and the lines running to the pumps were disconnected, but not de-energized. The lines, the court reasoned, no longer served any useful purpose and, therefore, should have been de-energized. *Id.* at 505-06.

In *Styles*, the owner's intent to abandon was made clear by the removal and disconnection of the pumps and the fact that it controlled the overhead power lines. Because the owner and supplier were the same entity, no issue arose concerning utility customer's intent. Moreover, the landowner in *Styles*, unlike Mrs. Harness, did not pay a monthly amount to a utility company that re-affirmed her intent to have electricity available to her home. Unlike the pumps in *Styles*, the residence, although unoccupied, was still in place on the realty.

expert reports. Matilla argues on appeal that this exclusion was error.

We review the district court's decision to exclude Geiger's report for an abuse of discretion. *Sommer v. Davis*, 317 F.3d 686, 692 (6th Cir. 2003). District courts have broad discretion to exclude untimely disclosed expert-witness testimony. *Pride v. BIC Corp*., 218 F.3d 566, 578-79 (6th Cir. 2000)(upholding the exclusion of untimely expert-witness reports and affidavits).

Federal Rule 26(a)(2)(B) requires parties to make mandatory disclosures about their experts. The Rule clearly requires a party using a retained expert to furnish a written report containing "a complete statement of all opinions to be expressed and the basis and reasons therefor." Fed. R. Civ. P. 26(a)(2)(B). Federal Rule of Civil Procedure 37(c)(1) requires compliance with Rule 26(a), "'mandat[ing] that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified.'" *Roberts v. Galen of Virginia, Inc.*, 325 F.3d 776, 782 (6th Cir. 2003)(quoting *Salgado v. General Motors Corp*., 150 F.3d 735, 742 (7th Cir. 1998)(noting that "the sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless."))

The sanction issued by the district court excluding Geiger's second opinion was not an abuse of discretion. The deadline for producing liability expert reports for use at trial was June 15, 2005. Geiger produced his first report within this deadline, and the district court permitted Geiger's testimony with respect to his opinions contained within it.

Geiger first opined in June, 2005 that SKRECC had violated its duty of care by allowing an abandoned line to remain energized. On the morning of his deposition on November 15, 2005, however, Geiger made a second visit to the scene of the accident, although the conditions were the

same and nothing in the area had not been observable on his first visit. During his November 15, 2005 deposition, Geiger opined for the first time that the line should have been de-energized because the meter box and outer conduits created safety hazards, an opinion he had not reduced to writing. Because the conditions at the scene of the accident had not changed, this second theory of liability was based on preexisting facts.

We defer to the district court's judgment that Matilla "ha[d] been dilatory in the discovery process and [that] Geiger's additional expert opinion [was] submitted well outside the time permitted." *See Primus v. United States*, 389 F.3d 231, 234-36 (1st Cir. 2004)(holding that the district court properly excluded supplemental expert evidence where plaintiff had been granted multiple discovery extensions, had filed the supplemental disclosures months after the deadline, and the supplemental information was cumulative of other expert evidence); *Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 148 (3d Cir. 2000)(affirming exclusion of supplementary Rule 26 disclosures where plaintiff inexcusably delayed such disclosures, which would have necessitated substantial additional preparation and might have delayed trial); *Metro Ford Truck Sales, Inc. v. Ford Motor Co.*, 145 F.3d 320, 325 (5th Cir. 1998)(holding that the district court did not abuse its discretion in denying plaintiff permission to designate an expert one week after the deadline, where the expert's written report was not filed until three months later because "[t]he purpose of supplementary disclosures is just that– to supplement. Such disclosures are not intended to provide an extension of the expert designation and report production deadline." (footnote omitted)).

## IV.

Because the properly excluded supplementary evidence is the only support for her claim,

Matilla cannot establish that SKRECC breached the duty of care that it allegedly owed to her. The judgment of the district court is therefore **AFFIRMED** on this ground.