Sedona HOLLAND, Successor Administratrix of the estate of Kenneth Wayne Holland, deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 75–0158–0(G).

United States District Court,
W. D. Kentucky,
Owensboro Division.

Dec. 18, 1978.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JAMES F. GORDON, District Judge.

This matter came on for trial by the Court without a jury on December 4, 1978. Following the close of plaintiff's case, the Government moved under Federal Rule of Civil Procedure 41(b) for involuntary dismissal of the plaintiff's action on the ground that upon the facts presented and the law the plaintiff had shown no right to relief. After considering the stipulations of the parties, the testimony of various witnesses called by the plaintiff, the exhibits admitted into evidence on behalf of the plaintiff, and the arguments of counsel, the Court determined that judgment against the plaintiff should enter. In accordance with Rule 52(a), the Court now makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. On April 9, 1973, Kenneth Wayne Holland, an employee at the River Queen Underground Mine No. 1, Peabody Coal Co., Greenville, Muhlenberg County, Kentucky, was killed when he became caught in a piece of underground equipment known as a belt conveyor tailpiece.

2. Holland died as a result of head injuries and a broken neck resulting from the accident aforesaid.

3. The River Queen Underground Mine No. 1 is enormous in size,[1] and a proper understanding of this case requires some description of its method of operation. In very general terms, coal at the River Queen is mined underground at the "face," transported from the face area in shuttle cars to another point underground, discharged onto belt conveyors, and transported by belt to the surface. Typical of underground coal mines, the River Queen is not "lighted" like a room. Its "tunnels" are in fact elaborate

Charles A. Williams, David Sparks, Williams, Housman & Sparks, Paducah, Ky., Kenneth B. Kusch, Central City, Ky., for plaintiff.

Albert Jones, U. S. Atty., Louisville, Ky., David Waller, James P. Klapps, Raymond A. Nowak, Ignazio J. Ruvolo, Bruce A. Menk, Trial Attys., U. S. Dept. of Justice, Washington, D. C., Alan Yamamoto, Trial Atty., Dept. of Labor, Arlington, Va., for defendant.

1. The Court notes that the map showing the underground workings of the River Queen Mine offered into evidence (Plaintiff's Exhibit 10) measures approximately 8 ft. × 8 ft., on a scale of 1 inch = 200 ft. The mine contains literally miles of underground conveyor belt.

systems of several separate entries which parallel one another, separated by coal for support purposes, which follow a seam of coal underground. The seam of coal at the River Queen averages only 48 inches in height.

4. At the time of the accident, the particular tailpiece within which Holland became caught was located along the belt entry of the "6 west" submain running off of the "main north," outby the intersection of the "1 south" panel.

5. This particular tailpiece was a "home-made" device which had been constructed in the River Queen shop, and was merely one of many tailpieces located in the mine.

6. There is little evidence as to how long this particular tailpiece had been in the River Queen Mine. Mine manager Russell Revlett could only testify that the tailpiece had been constructed and placed in the mine somewhere between 3–6 months prior to the accident, when the "2 south" panel was driven off the "6 west" submain. Such 3–6 month period constitutes the relevant time period for purposes herein.

7. Revlett further testified that subsequent to the mining of the "2 south" panel, and prior to the driving off of the "1 south" panel—a period of as much as 2–3 months—this particular tailpiece could not have been in use in the "6 west" submain, since it would not accommodate a certain piece of equipment (ratio feeder) needed for mining operations during this period.

8. The particular tailpiece within which Holland became caught was only used intermittently in the "6 west" submain during the 3–6 month period preceding the death of Kenneth Holland.

9. On the day of his death, Holland was employed as a general laborer (belt cleaner) underground, assigned to clean the numbers "1 south" and "6 west" belts.

10. There were no eyewitnesses to the fatal accident involving Kenneth Wayne Holland.

11. Shortly before the accident, at approximately 8:30 a. m., Holland had been observed by Junior Wagner, a fellow employee, shoveling along the number "1 south" belt.

12. Holland was not seen again until approximately 9:15 a. m., when he was found caught between the end of the tail pulley and the belt frame structure of the tailpiece by Ronnie Bennett, a fellow employee.

13. Prior to the April 9, 1973 accident in litigation, federal mine inspectors with the Bureau of Mines, Department of the Interior[2] had been present at the River Queen Underground Mine for the purpose of conducting periodic health and safety inspections pursuant to the Coal Mine Health and Safety Act of 1969, 30 U.S.C. § 801, et seq. (1970).

14. At the time of the accident, the particular tailpiece within which Kenneth Wayne Holland became caught was unguarded.

15. On March 31, 1973—just ten (10) days prior to the accident in litigation—a new regulation published at 38 Fed.Reg. 4976 (Friday, February 23, 1973), and later codified at 30 C.F.R. § 75.1722 (July, 1973), became effective, requiring in relevant part that "(a) . . . tail . . . pulleys . . . which may be contacted by persons, and which may cause injury to persons shall be guarded" and "(b) [g]uards at . . . conveyor tail-pulleys shall extend a distance sufficient to prevent a person from reaching behind the guard and becoming caught between the belt and the pulley."

16. There is no evidence that any federal inspectors in the River Queen Mine during the ten (10) day period subsequent to the effective date of the new regulation [March 31, 1973] and prior to the date of the accident [April 9, 1973] ever observed the particular tailpiece within which Holland became caught.

---

2. Subsequently renamed the Mining Enforcement and Safety Administration [MESA], still within the Department of the Interior. Effective March 9, 1978, MESA became MSHA, the Mine Safety and Health Administration, within the Department of Labor. See Pub.L.No.95–164, 91 Stat. 1319, 95th Cong., 1st Sess., § 302(a) (November 9, 1977).

17. There is no evidence from which this Court can infer that any federal inspectors in the River Queen Mine during the ten (10) day period subsequent to the effective date of the new regulation [March 31, 1973] and prior to the date of the accident [April 9, 1973] should have seen the particular tailpiece within which Holland became caught.

18. The mere failure of federal inspectors to observe the particular tailpiece within which Holland became caught during the ten (10) day period subsequent to the effective date of the new regulation [March 31, 1973] and prior to the date of the accident [April 9, 1973] does not demonstrate a want of care in the conduct of their inspection activities during such ten (10) day period.

19. Prior to the new regulation which became effective on March 31, 1973, there had been no regulation specifically requiring mechanical equipment guards on belt conveyor tail pulleys.

20. Prior to March 31, 1973, the particular tailpiece within which Holland became caught violated no mandatory health or safety standard.[3]

21. Prior to March 31, 1973, if observed by a federal mine inspector, such inspector could have determined that no enforcement action was warranted against such tailpiece. Alternatively, such inspector could have determined that such tailpiece was appropriately the subject of either a "safeguard notice"[4] or a "withdrawal and debarment [closure] order."[5] However, the issuance of either a safeguard notice or a closure order does not call for the application of a clear rule to a clear factual situation, but rather is discretionary with the individual inspector.

22. Plaintiff called as witnesses James E. Franks, Darold N. Gamblin and Gazi Bokkon, federal mine inspectors who had been in the River Queen Underground Mine No. 1 prior to March 31, 1973, for the purpose of conducting periodic health and safe-

3. Plaintiff's argument that the tailpiece violated standards found at 30 C.F.R. § 75.512 (1972) and 30 C.F.R. § 77.400 (1972) is without merit. The "500 series" of 30 C.F.R. part 75 (sections 75.500 through 75.523-3) pertain only to electrical equipment in underground coal mines. This particular tailpiece was not a piece of electrical equipment for purposes of the application of that section and could not have been cited for violation of that section. Part 77 of 30 C.F.R. applies only to surface mines or surface areas of underground mines. Since the tailpiece within which Kenneth Holland became caught was underground at the River Queen, it could not have been cited for violation of section 77.400.

4. Section 75.1403 of 30 C.F.R. (1972) provided that "[o]ther safeguards *adequate, in the judgment of an authorized representative of the Secretary,* to minimize hazards . . . shall be provided" (emphasis supplied). The subparts of section 75.1403 do not go on to include any criteria respecting belt conveyor guards. However, the *Coal Mine Safety Inspection Manual for Underground Mines* (September, 1972) (Plaintiff's Exhibit 9)—the operative manual in effect at all times relevant hereto—provided as follows:

 75.1403 *Other safeguards.* These safeguards, in addition to those included as criteria in the Federal Register, *may* be considered of sufficient importance to be required in accordance with 75.1403. *It must be remembered that these safeguards are not*

*mandatory.* If an authorized representative of the Secretary determines that a transportation hazard exists, *the determination is to be made on a mine-by-mine basis,* and the hazard is not covered by a mandatory regulation, the authorized representative must issue a safeguard notice allowing time to comply before a 104(b) Notice can be issued. Nothing here is intended to eliminate the use of a 104(a) Order when an imminent danger exists.

 \* \* \* \* \* \*

 6. Guards shall be provided at conveyor-drives, conveyor-heads, and conveyor-tail pulleys, and shall extend a distance sufficient to prevent a person from reaching behind the guard and becoming caught between the belt and pulley (emphasis supplied).

5. Section 104(a) of the 1969 Act [30 U.S.C. § 814(a)] provides in relevant part:

 (a) *If,* upon any inspection of a coal mine, *an authorized representative* of the Secretary *finds that an imminent danger exists,* such representative shall . . . issue forthwith an order requiring the operator of the mine . . . to cause immediately all persons . . . to be withdrawn from . . . such area . . . . (emphasis supplied) "Imminent danger" is defined at 30 U.S.C. § 802(j) as "any condition or practice in a coal mine which could reasonably be expected to cause death or serious physical harm before such condition or practice can be abated."

ty inspections. None of these inspectors testified to having seen the particular tailpiece within which Holland became caught during any of their inspection activities.

23. There is no evidence that any federal mine inspectors in the River Queen Mine prior to March 31, 1973 ever observed the particular tailpiece within which Holland became caught.

24. There is no evidence from which this Court can infer that any federal inspectors in the River Queen Mine prior to the March 31, 1973 effective date of the new regulation should have seen the particular tailpiece within which Holland became caught.

25. There is no evidence from which this Court can infer that, even if defendant's inspectors did or should have seen this particular tailpiece prior to the March 31, 1973 effective date of the new regulation, the decision of whether to have taken any regulatory enforcement action with respect to such tailpiece would have been anything but a matter falling within their discretion.

26. There is no evidence from which this Court can find or infer any negligence on the part of the defendant's mine inspectors in the conduct of their inspections at the River Queen Underground Mine No. 1 prior to the date of the accident in litigation.

27. The acts of defendant's mine inspectors in conducting their regulatory activities at the River Queen Underground Mine No. 1 were neither the cause-in-fact, nor a proximate cause, of the death of Kenneth Wayne Holland.

28. Following notification of the accident, the Bureau of Mines conducted an investigation into the mishap. This investigation resulted in the issuance of the following orders and notices:

(a) Order No. 1 WMC, issued April 9, 1973, at 10:15 a. m., requiring the closure of the mine for the purpose of the Bureau completing its investigation into the accident. This Order was modified by Order No. 1 CED, issued April 9, 1973, at 1:00 p. m., to allow production to resume at the mine during the pendency of the accident investigation.

(b) Notice No. 1 CED, issued April 9, 1973, at 12:30 p. m., for Peabody Coal Co.'s violation of that standard found at 38 *Fed. Reg.* 4976 (Friday, February 23, 1973), *codified at* 30 C.F.R. § 75.1722 (July, 1973), requiring that tail pulleys be guarded. This Notice was terminated by Notice No. 02 GM, issued April 9, 1973, at 4:00 p. m., when Peabody Coal Co. constructed a guard on the tail pulley.

29. The investigation conducted by the Bureau of Mines also resulted in a written report of that investigation prepared by then Subdistrict Manager William M. Craft (Plaintiff's Exhibits 2, 3).

30. On March 19, 1975, David and Joseph Holland, then Co-Administrators of the Estate of Kenneth Wayne Holland, filed an administrative claim with the Department of the Interior in an amount of $538,965.20.

31. By letter dated September 16, 1975, the administrative claim was denied by the Department of the Interior.

32. On or about November 3, 1975, this action was commenced against the United States for the wrongful death of Kenneth Wayne Holland.

33. On April 7, 1976, Sedona Holland, the surviving spouse of Kenneth Wayne Holland, deceased, was appointed by the Muhlenberg County, Kentucky, Court as successor administratrix of his estate, and upon motion filed with this Court on or about April 15, 1976, was substituted as party plaintiff herein by Order dated May 7, 1976.

34. Any of the above findings of fact which may be deemed to be conclusions of law shall be so considered.

## CONCLUSIONS OF LAW

1. This is an action for the wrongful death of Kenneth Wayne Holland, brought against the national sovereign by the administratrix of his estate, Sedona Holland, relying upon the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671, *et seq.*, as the basis for this Court's jurisdiction. Venue is

properly before this Court by virtue of 28 U.S.C. § 1402(b).

2. An administrative claim was timely presented to the appropriate federal agency for the death of Kenneth Wayne Holland, which was denied by that agency. This suit was timely commenced thereafter. 28 U.S.C. §§ 2675(a), 2401(b). Findings of Fact ¶¶ 30–33.

3. During all times pertinent hereto, the River Queen Underground Mine No. 1 was an underground Coal Mine subject to the provisions of the Coal Mine Health and Safety Act of 1969, 30 U.S.C. § 801, *et seq.* (1970) and to the health and safety standards promulgated thereunder and found at 30 C.F.R. § 75.1, *et seq.*

4. Pursuant to their regulatory authority under section 103(a) of the Mine Safety Act [30 U.S.C. § 813(a)], federal mine inspectors are authorized to investigate and to inspect mines subject to the Act for the purpose, among others, of determining whether the mine operator is complying with the health and safety standards promulgated. 30 U.S.C. § 813(a)(4).

5. Under the provisions of section 104 of the Act, federal mine inspectors are authorized to issue "withdrawal and debarment [closure] orders" if, upon inspection, they *find* a condition or practice such that a danger exists which could reasonably be expected to cause death or serious physical harm before such condition or practice can be abated. 30 U.S.C. §§ 814(a), 802(j). *See* footnote 5, *supra.*

6. Under the further provisions of section 104 of the Act, federal mine inspectors are authorized to issue "notices to abate" if, upon inspection, they *find* violations by a mine operator of mandatory health or safety standards, but such failure on the part of the mine operator to comply with the standards has not created a danger that could reasonably be expected to cause death or serious physical harm before such condition or practice can be abated. 30 U.S.C. § 814(b).[6]

7. The regulatory enforcement powers of federal mine inspectors under the Act as aforesaid cannot come into play unless an inspector in fact *observes* the condition or practice which constitutes an "imminent danger" or violates a mandatory health or safety standard. Unless a condition or practice is "found," no power resides under the law for a mine inspector to take any action.[7]

8. Assuming without deciding that the United States owed an actionable tort duty to plaintiff's decedent in the conduct of its regulatory enforcement inspections of the River Queen under the Coal Mine Health and Safety Act of 1969,[8] it is clear

---

**6.** Technically, three additional enforcement tools are provided not relevant to this action. Section 814(c) provides a complicated, three-stage progression of a notice of violation and closure orders for a limited class of violations of the mandatory safety and health standards [unwarranted failure of operator to comply]. Section 814(h) provides for action by an inspector when unusual conditions arise for which there is no method of abatement under existing technology. Section 814(i) provides for the issuance of notices and orders when the amount of respirable dust in a working area reaches an unacceptable level.

**7.** Support for this clear reading of the statutory language, to the extent that any is even necessary, may be found in the recent amendments to the 1969 Act. The Federal Mine Safety and Health Amendments Act of 1977, Pub.L.No.95–164, 91 Stat. 1300, 95th Cong., 1st Sess., § 104(a) (November 9, 1977) significantly provides:

(a) If, upon inspection or investigation, the Secretary or his authorized representative *believes* that an operator of a coal or other mine subject to this Act has violated this Act . . . [he shall issue a citation to the operator] (emphasis supplied).

It is clear to this Court that the language of this 1977 amendment recognizes the necessity under the 1969 Act of an *observed violation,* and seeks to broaden the enforcement powers of federal inspectors by permitting enforcement action based only upon a *reasonable belief that a violation has occurred.* Of course, the Coal Mine Health and Safety Act of 1969 as extant at the time of the accident in litigation (April 9, 1973) controls herein for all relevant purposes.

**8.** *See Raymer v. United States,* 455 F.Supp. 165 (W.D.Ky.1978). *Contra: Darlene Mercer, et al. v. United States,* 460 F.Supp. 329 (E.D. Ohio 1978); *Mosley v. United States,* 456 F.Supp. 671 (E.D.Tenn.1978); *Martha Krajnik v. John F. Meisner Engineers, Inc., et al.* Civil No. 74–

that, under the evidence presented, there was no breach of any such duty. Findings of Fact ¶¶ 16–18, 22–26.

9. Subsequent to the March 31, 1973 effective date of 30 C.F.R. § 75.1722 (July, 1973), and prior to the date of the accident in litigation, April 9, 1973, federal inspectors present at the River Queen during such ten (10) day period had the obligation to issue a notice of violation on an unguarded tailpiece such as the one in which Holland became caught if they observed such violation of that newly-issued mandatory safety standard.[9] However, no negligence can be found or inferred from the mere fact that federal inspectors present during the ten (10) day period did not observe this particular tailpiece. Findings of Fact ¶¶ 16–18.

 10. Prior to the March 31, 1973 effective date of 30 C.F.R. § 75.1722 (July, 1973), federal inspectors present at the River Queen had no obligation to take any enforcement action against an unguarded tailpiece such as the one in which Holland became caught. Findings of Fact ¶¶ 19–21. Whether, if observed,[10] such a tailpiece should have been the subject of either an "imminent danger" order or a "notice to provide safeguards" was a matter falling within the "broadest possible discretion" accorded federal mine inspectors under the Coal Mine Health and Safety Act of 1969. *United States v. Consolidated Coal Co.,* 560

F.2d 214, 218 (6th Cir. 1977). This Court does not believe that these judgmental decisions of federal mine inspectors to exercise, or to refrain from exercising, their regulatory enforcement powers should be tested through the medium of private civil actions in which each plaintiff would be a self-appointed ombudsman forcing the exercise of these options. *See Smith v. United States,* 375 F.2d 243, 248 (5th Cir.), *cert. denied,* 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967).

 11. The acts of defendant's mine inspectors in conducting inspections of the River Queen Underground Mine No. 1, even if negligent, were not the proximate cause of the death of plaintiff's decedent. Findings of Fact ¶ 27. Proof of proximate causation is, of course, requisite to recovery under Kentucky law. *Texaco, Inc. v. Standard,* 536 S.W.2d 136 (Ky.1975); *M & T Chemicals, Inc. v. Westrick,* 525 S.W.2d 740, 741 (Ky.1975).

12. In light of this Court's finding that plaintiff has failed to sustain her burden of proof on the issues of negligence and causation, it is unnecessary for this Court to address the Government's further contentions that plaintiff's action is barred by the "discretionary function" and "due care" exceptions found at 28 U.S.C. § 2680(a), and by the "misrepresentation" exception found at 28 U.S.C. § 2680(h).

---

10071, USDC E.D. Mich. (filed March 17, 1976). *See also Chaneyfield v. City of New York,* 525 F.2d 1333 (2d Cir. 1975), *cert. denied,* 425 U.S. 912, 96 S.Ct. 1509, 47 L.Ed.2d 763 (1976).

**9.** This is not to say that the "obligation" created thereby necessarily constitutes the kind of duty cognizable by tort law. As noted, *supra,* this Court has assumed for the purpose of this opinion the existence of an actionable tort duty arising out of the Government's inspections of the River Queen Mine. However, *as has been noted elsewhere:*

> Not all acts and orders of the United States government are so sovereign that they must be treated as commands which create legal duties or standards, the violation of which involves breaking the law. A considerable part of *the government's conduct is in the* context of an employer-employee relationship, a relationship which includes reciprocal duties between the government and its staff,

but not necessarily a legal duty to its citizenry.

\* \* \* \* \* \*

> Even assuming, as plaintiffs contend, that this order was mandatory, the duty it creates is that of the District office employees to perform their jobs in a certain way as directed by their superiors. This duty to comply with the directives of their superiors is owed by the employees to the government and is totally distinguishable from a duty owed by *the government to the public on which liability* could be based. The failure to perform the order may be grounds for internal discipline, but it does not follow that such conduct necessarily constitutes the kind of breach cognizable by tort law.

*Zabala Clemente v. United States,* 567 F.2d 1140, 1144–45 (1st Cir.), *cert. denied,* 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978).

**10.** Again, no such evidence was adduced at trial. Findings of Fact ¶¶ 22, 23.

13. Plaintiff having failed to sustain her burden of proof on the issues of negligence and causation, there can be no liability on the part of the United States for the death of plaintiff's decedent. The complaint must therefore be dismissed.

Let separate judgment in conformance herewith be entered as provided by Rule 58.

Costs to be awarded as provided by law.