Gwynith RAYMER, Administratrix of the Estate of Ronald Latney Raymer, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Marilyn GILL, Administratrix of the Estate of David R. Gill, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. C 76–0119–L(B).

United States District Court, W. D. Kentucky, Louisville Division.

Oct. 19, 1979.

---

MEMORANDUM CONTAINING
FINDINGS OF FACT AND
CONCLUSIONS OF LAW

BALLANTINE, District Judge.

This matter was heard by the Court without a jury on November 30 and December 1, 1978. It is now before the Court for findings of fact, conclusions of law and entry of a judgment.

## FINDINGS OF FACT

(1) Plaintiff, Gwynith Raymer, is the duly qualified administratrix of the estate of Ronald Raymer, deceased, and Marilyn Gill is the duly qualified administratrix of the estate of David R. Gill, deceased. (Stipulation with respect to facts, exhibits and certain other matters filed November 30, 1978 [hereafter "Stipulation"], Para. 11.) Plaintiffs' decedents met their deaths from injuries sustained when a 988 front end loader overturned on January 8, 1972 (Stipulation, Para. 7). Ronald Raymer's date of birth was March 17, 1951, and his funeral expenses amounted to $3070.00 (Stipulation, Para. 10). David Gill's date of birth was January 21, 1945, and his funeral expenses were $1656.75. (Stipulation, Para. 9). No claim is asserted by either plaintiff for pain and suffering prior to death of her intestate (Stipulation, Para. 8).

(2) On January 8, 1972, at about 4:00 p.m., plaintiffs' decedents reported for work at Peabody Coal Company's Sinclair Mine, Drakesboro, Muhlenberg County, Kentucky. They were instructed by their immediate superior to take the 988 front end loader to the 4500 Pit to extricate a truck which had become mired in the mud. They apparently became confused and drove on several roads that did not lead to the 4500 Pit. At about 5:45 p.m. Robert Millard, an electrician, found skid marks on the TVA levee. He stopped his truck and saw the 988 front end loader lying on its top at the foot of an embankment. He called for help and a crane was brought to the area and the front end loader was turned upright. Plaintiffs'

Harold M. Streets, Greenville, Ky., Charles A. Williams, Paducah, Ky., for plaintiff Raymer.

William P. Hurley, Edward Ewen, Jr., Louisville, Ky., Vaughn & Vaughn, Henderson, Ky., for plaintiff Gill.

James P. Klapps, Asst. Director, Raymond A. Nowak, Charles E. Mandolia, Trial Attys., Torts Branch, Dept. of Justice, Washington, D. C., Albert Jones, U. S. Atty., Mikell Grafton, Asst. U. S. Atty., Western Dist., Louisville, Ky., for defendant United States.

decedents were removed from the cab and taken to Muhlenberg County Hospital, where they were pronounced dead on arrival (Depo. Troy Wills, Exhibit E, p. 4).

(3) It was impossible to determine who had been driving the front end loader at the time it overturned. The levee on which the accident occurred was used both by mine employees and TVA employees (Transcript of Evidence, Volume 1, pp. 141, 160, 165, 186, 197, 202; Transcript of Evidence, Volume 2, p. 63). The front end loader was used any place it was needed. It was not restricted to the shop area (T.E. Volume 1, pp. 167, 196, 205; T.E. Volume 2, p. 39).

(4) The front end loader was not equipped with a roll over protection structure (ROPS) (Stipulation, Para. 5).

(5) The roadway on which the accident occurred did not have berms or guardrails (Stipulation, Para. 6), and it was elevated 27 feet above the natural terrain (Wills Depo., Exhibit E, p. 5).

(6) On August 10, 1971, Federal Inspector Troy Wills issued a notice of violation of 30 C.F.R. Section 77.403 which requires ROPS on mobile equipment (Depo. Troy Wills, p. 12, Exhibit B–1). The notice directed that the violation "shall be totally abated by 8:00 a. m. on September 13, 1971" (Depo. Troy Wills, pp. 14 and 15, Exhibit B–1). On September 13, 1971, the violation was not abated but an extension was granted to October 13, 1971, because the company stated that it had ordered ROPS (Depo. Troy Wills, p. 15). The copy of the order given by the company to Wills did not have the name of any company from which the ROPS were ordered (Depo. Troy Wills, p. 16, Exhibit C). Instead of granting the extension Wills could have ordered the equipment removed from service (Depo. Troy Wills, p. 19). Further extensions were granted to the company on October 13, 1971, November 10, 1971, December 9, 1971, and January 6, 1972 (Depo. Troy Wills, p. 20). On February 3, 1972, after the fatal accident, the equipment was ordered removed from service (Depo. Troy Wills, p. 20), and by February 16, 1972, all equipment at the mine had ROPS (Depo. Troy Wills, p. 22). From August 10, 1971, Wills knew that the order for ROPS had not been placed (Depo. Troy Wills, pp. 25–26).

(7) The extensions referred to above were granted after company employees exhibited a "Mine Purchase Order" to the federal inspector. The purchase order was unsigned and was not directed to any vendor but the suggested vendor was designated "Best Place" (Depo. Troy Wills, Exhibit C).

(8) About 200 ROPS were sold by Whayne Supply Company (Whayne) between June 1, 1971, and December 31, 1971. The ROPS were delivered within 30 to 45 days from the date of the order (T.E. Volume 1, pp. 84–86). Whayne did not receive an order for ROPS from Peabody for its Sinclair Mine before the accident in question (T.E. Volume 1, p. 91).

(9) At the time of their deaths, Ronald Raymer's life expectancy was 52.55 years and David Gill's life expectancy was 46.95 years.

(10) Ronald Raymer's gross income in 1970 was $13,970.10 and in 1971 was $15,625.50, an average for the 2 years of $14,797.80 (Gwynith Raymer's Answer to Interrogatories No. 38, first set of Interrogatories propounded by defendant Feb. 20, 1974).

(11) Ronald Raymer had an anticipated work life of 45 years. Disregarding any inflationary factor or accretion in his earning capacity, he had an anticipated gross income during that period of $665,901.00.

(12) David Gill's gross income in 1970 was $14,394.32 and in 1971 was $14,840.02, for an average income for the 2 years of $14,617.17. (Marilyn Gill's Answer to Interrogatory No. 28, first set of Interrogatories propounded by defendant February 15, 1974).

(13) David Gill had an anticipated work life of 39 years. Disregarding any inflationary factor or accretion in his earning capacity, he had an anticipated gross income during that period of $570,069.63.

(14) The total damage suffered by the plaintiff, Gwynith Raymer, for the destruction of Ronald Raymer's power to labor and earn money and his funeral expenses is $668,971. The total damage suffered by plaintiff, Marilyn Gill, by reason of the destruction of David Gill's power to labor and earn money and his funeral expenses is $571,726.38.

(15) The substantial factors which caused and brought about the deaths of Raymer and Gill were the absence of ROPS and the absence of berms or guardrails on the elevated roadway at the scene of the accident.

(16) There is no evidence in the record to support the allegation of contributory negligence raised by the defendant.

## CONCLUSIONS OF LAW

(1) The Court has jurisdiction over the parties and the subject matter of this action. Title 28 U.S.C. Section 1346(b).

(2) The liability of the defendant is to be determined according to the law of Kentucky. Title 28 U.S.C. Sections 1346(b) and 2674. *See also Hess v. United States*, 361 U.S. 314, 80 S.Ct. 341, 4 L.Ed.2d 305 (1960).

(3) The statute in effect on the date of the accident read in pertinent part:

"The Secretary shall, in accordance with the procedures set forth in this section, develop, promulgate, and revise, as may be appropriate, improved mandatory safety standards for the protection of life and the prevention of injuries in a coal mine, and shall, in accordance with the procedures set forth in this section, promulgate the mandatory health standards transmitted to him by the Secretary of Health, Education and Welfare." 30 U.S.C. Section 811(a).

"Authorized representatives of the Secretary shall make frequent inspections and investigations in coal mines each year for the purpose of (1) obtaining, utilizing, and disseminating information relating to health and safety conditions, the causes of accidents and the causes of diseases and physical impairments originating in such mines, (2) gathering information with respect to mandatory health or safety standards, (3) determining whether an imminent danger exists, and (4) determining whether or not there is compliance with the mandatory health or safety standards or with any notice, order, or decision issued under this subchapter." 30 U.S.C. Section 813(a).

(4) The regulations adopted by the Secretary may be found at 30 C.F.R. Section 77.403a:

"(a) All rubber-tired . . . front end loaders . . . that are used in surface coal mines . . . shall be provided with rollover protective structures (hereinafter referred to as ROPS) . . ..

*        *        *        *        *        *

(c)(4) [A]n authorized representative of the Secretary may require such mobile equipment to be equipped with ROPS at an earlier date when necessary to protect the operator of the equipment under the conditions in which the mobile equipment is, or will be operated. The authorized representative of the Secretary shall in writing advise the operator that the equipment shall be equipped with a ROPS and shall fix a time within which the operator shall provide and install the ROPS. If the ROPS is not provided and installed within the time fixed a notice shall be issued to the operator pursuant to Section 104 of the Act [30 U.S.C. Section 814].

(c)(5) Nothing in this Section 77.403a shall preclude the issuance of a withdrawal order because of imminent danger."

30 C.F.R. 77.1605(k) reads as follows: "Berms or guards shall be provided on the outer bank of elevated roadways."

(5) "Imminent danger" means the existence of any condition or practice in a coal mine which could reasonably be expected to cause death or serious physical harm before such condition or practice can be abated. 30 U.S.C. Section 802(j).

(6) In Kentucky when one who has undertaken to act discovers a dangerous

condition he is under an affirmative duty to take protective action. In *Haddad v. Louisville Gas & Electric Co.*, Ky., 449 S.W.2d 916 (1970), the Court said at page 918:

"Simply put, LG&E admits that it has the duty and authority to shut off a customer's gas appliance if it discovers a gas *leak* in the appliance's operation, but contends that it has no duty or any authority to shut off an appliance which does not evince a gas *leak*, even though that appliance is found to be emitting highly dangerous carbon monoxide fumes. We are of the opinion that LG&E did have the duty to do something protective when its employee discovered the highly dangerous condition of the furnace. Cf. *Current v. Columbia Gas of Kentucky*, Ky., 383 S.W.2d 139; *Bruce v. Alley*, Ky., 391 S.W.2d 678; *Smith's Adm'x v. Middlesboro Electric Company*, 164 Ky. 46, 174 S.W. 773, Ann.Cas.1917A, 1164. It is said in 138 A.L.R. 888:

'Whenever a gas company undertakes to make an inspection of pipes and appliances of a consumer of gas it must exercise care and diligence to make a thorough and adequate inspection and make the necessary repairs; *or, in the alternative, shut off the supply of gas* until the consumer has made the necessary repairs or replacements.' (Emphasis added.)

It will be observed that this principle does not impose on the company any initial duty to make an inspection of a consumer's appliances, or any duty to serve or police the appliance field. The stated duty grows out of an inspection which the company has chosen to make. We accept the principle as just stated and conclude that the trial court was in error in the conclusions of law upon which the directed verdict in favor of LG&E was based." (Emphasis in original.)

■ (7) In Kentucky if a governmental agency owes no legal duty to a specific person there exists no basis for liability against the agency. *Frankfort Variety, Inc. v. City of Frankfort*, Ky., 552 S.W.2d 653 (1977).

■ (8) Congress has declared that:

"(a) [T]he first priority and concern of all in the coal mining industry must be the health and safety of its most precious resource—the miner;

\*      \*      \*      \*      \*      \*

(g) it is the purpose of this chapter (1) to establish interim mandatory health and safety standards and to direct the Secretary of Health, Education, and Welfare and the Secretary of the Interior to develop and promulgate improved mandatory health or safety standards to protect the health and safety of the Nation's coal miners; (2) to require that each operator of a coal mine and every miner in such mine comply with such standards; (3) to cooperate with, and provide assistance to, the States in the development and enforcement of effective State coal mine health and safety programs; and (4) to improve and expand, in cooperation with the States and the coal mining industry, research and development and training programs aimed at preventing coal mine accidents and occupationally caused diseases in the industry." 30 U.S.C. Section 801.

The Congressional mandate imposes a duty on the defendant to see that mine safety regulations are vigorously and meticulously enforced.

■■ (9) If there is no underlying statutory duty to offer special protection to a citizen or a class of citizens there can be no basis for liability under general principles of tort law and the Federal Tort Claims Act. *Clemente v. United States*, 567 F.2d 1140 (1st Cir. 1977), *cert. denied*, 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978). Thus, if the actions of a government employee are discretionary, those actions are not within the ambit of the Federal Tort Claims Act. On the other hand, if the employee is not involved in formulating government policy, but is engaged in actions and directing the actions of other employees in carrying out an already formulated policy, the discretionary exclusion is inapplicable. In *Downs v. United States*,

522 F.2d 990 (6th Cir. 1975), the Court said at page 997:

"In this case, the FBI agents were not involved in formulating governmental policy. Rather, the chief agent was engaged in directing the actions of other Government agents in the handling of a particular situation. FBI hijacking policy was not being set as an *ad hoc* or exemplary matter since it had been formulated before this hijacking. Hijacking policy had previously been promulgated in the FBI Handbook and in a memorandum jointly issued by the Departments of Transportation and Justice. While the Government's guidelines for dealing with hijackings are secret and must remain so, we note that Special Agent O'Connor was not making policy in responding to this particular situation."

■ (10) The Court is not unaware of the holding of Judge Gordon in *Holland, Adm'x, Etc. v. United States*, 464 F.Supp. 117 (W.D.Ky.1978). The Court believes the factual situation in *Holland* may be distinguished. In *Holland* the alleged negligence of defendant's employees amounted to a passive failure to make inspections. In the case at bar, the Court finds that the affirmative act of perpetuating obviously hazardous conditions by granting unwarranted extensions to Peabody in the absence of any acceptable evidence that Peabody could not comply with the regulations amounts to actionable negligence for which defendant is liable.

■ (11) The measure of damages for wrongful death in Kentucky is the destruction of the decedent's power to labor and earn money. This does not mean that the measure of damages is the destruction of his employment opportunities in his particular trade or profession. In *Roland v. Beckham*, Ky., 408 S.W.2d 628 (1966), the Court said at page 635:

"As noted, our rule of damages in such cases is the destruction of the *power* to earn money—not the destruction of decedent's income from the particular work in which he was engaged at the time of the wrongful death." (Emphasis in original.)

This rule has been adopted in this Circuit. *See Amerco Marketing Co. of Memphis, Inc. v. Myers*, 494 F.2d 904, 913 (6th Cir. 1974).

(12) Plaintiff, Gwynith Raymer, Administratrix of the Estate of Ronald Raymer, Deceased, is entitled to recover of the defendant, United States of America, the sum of $668,971.00, and the plaintiff, Marilyn Gill, Administratrix of the Estate of David Gill, is entitled to recover from the defendant, United States of America, the sum of $571,726.38, and a Judgment in accordance with these findings and conclusions has been entered this date.